**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HL BUILDERS, LLC f/k/a** | § | **Case No. 19-32825** |
| **CD HOMES, LLC,** | § | |
| | § | |
| **Debtor.** | § | **(Chapter 11)** |

**PETITIONING CREDITORS' BRIEF IN SUPPORT OF INVOLUNTARY PETITION**

TO THE HONORABLE EDUARDO V. RODRIGUEZ, BANKRUPTCY JUDGE:

Houtex Builders, LLC ("Houtex"), 415 Shadywood, LLC ("Shadywood"), and 2203 Looscan Lane, LLC ("Looscan" and collectively with Houtex and Shadywood, the "Petitioning Creditors") file this *Brief in Support of Involuntary Petition* against HL Builders, LLC[1] (the "Debtor"), and respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      As this Court observed, a trial to dismiss an involuntary proceeding "is not one of these normal trials where you have a discovery period and you have pretrial orders and stipulations to exhibits and things of that nature."[2]  Therefore, a dismissal of an involuntary bankruptcy case should not be granted unless it "appears to a certainty" that the petitioning would be entitled to no relief under any circumstances. *In re Sundown Assocs.*, 150 B.R. 156, 158 (Bankr. E.D. Va. 1992) (citing *Rogers v. Jefferson Pilot Life Insurance Co.*, 883 F.2d 324, 325 (4th Cir.1989)).  Here, Petitioning Creditors' presented a set of facts at trial that meet the standards that section 303 of the Bankruptcy Code require.[3]  Therefore, dismissal is not appropriate.

---

[1]      On September 14, 2018, CD Homes, LLC filed a Certificate of Amendment with the Texas Secretary of State to change its name to HL Builders, LLC.

[2]      8/20/19 Hr. 116:8-10.

[3]      11 U.S.C. §§ 101 – 1532.

2.      The Debtor is a home building company.[4]   Each of the Petitioning Creditors are special purpose entities set up to build one or more homes with the Debtor (each a "Project").[5] Each of the Petitioning Creditors is a party to certain contracts with the Debtor, including an Investor Agreement (defined below).[6]   The Investor Agreements set forth how the Projects are to be financed.[7]   Specifically, the Investor Agreements provide that there will be a construction loan and an equity loan in connection with each Project and the Debtor is to provide any additional funds required for the Project.[8]   Furthermore, the Investor Agreements establish how the net proceeds are to be distributed upon the sale of the Project.[9]   The Investor Agreements provide that if there are insufficient funds at closing to make the required payments set forth in the Investor Agreement then the Debtor is to make up the shortfall at closing of the Project.[10]

3.      Here, each Petitioning Creditor sold a Project at the end of 2018 or beginning of 2019.[11]   In each of these cases the net proceeds from the sale of the Projects were insufficient to make the required payments under the Investor Agreement.[12]   In each of these cases, the Debtor did not come to closing to make up the shortfall.[13]

4.      In an attempt to escape its obligations under the Investor Agreement, the Debtor alleges that the Investor Agreements were modified.  As discussed in more detail below, these

---

[4]     Petitioning Creditors' Exhibits 1, 2, 3 and 4.
[5]     See *id*.
[6]     *Id*.
[7]     *Id*., Investor Agreements.
[8]     *Id*., Investor Agreements, § 6.
[9]     *Id*., Investor Agreements, § 8.
[10]    *Id*.
[11]    7/16/19 Hr. 47:17-18; 64:23-65:1. 68:11-13.  8/20/18 Hr. 67:4-8.
[12]    7/16/19 Hr. 59:25-60:21; 64:23-65:1; 67:1-69:11.
[13]    8/20/18 Hr. 61:7-12; 67:4-8.  With respect to making a written demand for payment, the Petitioning Creditors contend that such demand would be futile as the Debtor is refusing to acknowledge liability as evidenced by the trial for this involuntary bankruptcy and Mr. Parker said the Debtor had no money.  See 8/20/19 Hr. 92:8-15.

arguments lack a legal and factual basis.

5.      Additionally, the testimony of Mr. Parker, the Debtor's representative, directly conflicts with the testimony of Mr. Foster, the Petitioning Creditors' representative.   In response to the question "did you ever agree to amend or modify the investor agreements associated with any of the petitioning creditors?" Mr. Foster responded: "No. I don't remember any of those discussions of anything like that. No, not at all."   Accordingly, the Court must evaluate the credibility of the witnesses.[14]

6.      The credibility of the witnesses is telling on a key issue – whether Mr. Foster ever asked Mr. Parker to delay construction of the Projects.  Mr. Parker relies on this argument – that Mr. Foster requested the delays – as the basis for the alleged modifications.[15]  When Mr. Parker was asked why the Petitioning Creditors would make such a request to delay construction in light of the fact that the Debtor guaranteed a profit to each of the Petitioning Creditors under the Investor Agreement, Mr. Parker responded: "I can only relay to what [Mr. Foster] personally said to me. And his personal comments were, Bob, we could get into trouble here whereabouts. I'm really concerned about what's going to happen with these projects. Delay, delay, delay."[16]

7.      However, such a request would make no sense because the Petitioning Creditors would only realize a profit upon the sale of the Projects and therefore would want the Projects constructed and sold as quickly as possible.   In fact, when Mr. Foster was asked whether he asked to delay construction he responded: "No. I want to be very clear. It was just the opposite.  I was extremely frustrated that it was taking so long to complete the construction because in my simple

---

[14]      8/20/19 Hr. 81:7-11.
[15]      8/20/19 Hr. 41:2-6 ("I'm going to respond to what he said to me. Bob, I am very concerned about these projects. The market may turn bad. Let's delay, delay, delay, delay, delay. Well, at that point in time, that is a significant modification of an arrangement.")
[16]      8/20/19 Hr. 41:17-20.

mind we weren't going to be able to sell the properties.  I even knew, I didn't consider myself very knowledgeable in this, but I even knew that I was focused totally on the bank construction loan that I was fully aware of that I had guaranteed, that that wasn't going to be repaid until we sold the properties. And we couldn't sell the properties until the construction was completed. I complained and had expressed frustration over and over again that it was taking so long, at some point."[17]  Mr. Foster said that what he wanted to "delay" was doing any additional projects with Mr. Parker: "And I told him I did not want to do any more developments with him."[18]   The terms of the Contractor Agreements support Mr. Foster's testimony as the Contract Agreements provide that the Debtor shall complete construction within twelve months of the commencement date.[19]

8.      Here, Mr. Foster's testimony is credible, and Mr. Parker's testimony is not.  The Petitioning Creditors had every incentive to have the construction of the Projects completed as quickly as possible.   It even makes less sense that the Petitioning Creditors would request a delay in construction, and then have this request serve as the basis to modify the Investor Agreement to waive hundreds of thousands of dollars that the Debtor would otherwise be obligated to pay.

9.      It is undisputed that the Projects subject to the Investor Agreements were sold and it is undisputed that the Debtor did not come to closing with any funds.   Since there were no legal modifications to the Investor Agreements, the Debtor was obligated to bring to closing the shortfalls necessary to make the required payments under the Investor Agreements and it failed to do so.

---

[17]      8/20/19 Hr. 80:21-81:6.
[18]      8/20/19 Hr. 85:9-10.
[19]      Petitioning Creditors' Exhibits, 1, 2 and 4, Contractor Agreements, § 2.

**FACTUAL BACKGROUND**

10.     During 2013 and 2014, each of the Petitioning Creditors entered into a set of contracts with the Debtor.[20]   These contracts establish the terms of the construction and financing of a single-family home (each such home construction project, a "Project").[21]   The contracts include a certain investor agreement (each, an "Investor Agreement") which establishes how the Projects are financed.[22]

11.     Each Investor Agreement discloses that there is a construction loan and a certain equity loan (each an "Equity Loan") for each Project.[23]   The Investor Agreements provide that if funds are required to make any payments that exceed the sum of the construction loan and the Equity Loan, "*all such funds are to be provided by [the Debtor]*."[24]

12.     Even though the terms of the Investor Agreement indicate that the Equity Loans are provided by the "Investor" *i.e.*, the respective Petitioning Creditor, the Debtor alleges that third parties – rather than the Petitioning Creditors – provided the Equity Loans.  However, the Debtor through its representative Mr. Parker, is unable to identify which third-party provided the Equity Loan for each Project.[25]

13.     Giving the Debtor the benefit of the doubt that third parties provided the Equity Loans and not the Petitioning Creditors, the Debtor arranged for funding in connection with each of the Petitioning Creditors' Projects that far exceeded the amount of the permitted Equity Loans as set forth in the Investor Agreements.   Specifically, the Investor Agreements provide that the

---

[20]     Petitioning Creditors Exhibits 1, 2, 3, and 4.
[21]     *Id.*
[2222]   *Id.*, Investor Agreements.
[23]     *Id.*, Investor Agreements, §§ 6, 8.
[24]     *Id.*, Investor Agreements, § 6.
[25]     Petitioning Creditors Exhibit 8, Tr. 60:21-62:12; 62:15–62:22; 66:5-66:7

principal amounts of the Equity Loans are as follows: $405,000.00 for 415 Shadywood;[26]
$638,625.00 for 2203 Looscan;[27] $339,000 for 5325 Lynbrook;[28] and $459,750 for 3 Thornblade.[29]

       14.    The Debtor caused the Petitioning Creditors to use funds from third-party loans as
follows:

- Houtex entered into loan with Spirit of Texas Bank ("SOTB") in the amount of $1.6 million (the "$1.6 Million SOTB Note").[30] According to a Sources and Uses chart prepared by the Debtor,[31] the Debtor caused Houtex, Shadywood and Looscan to use proceeds from the $1.6 Million SOTB Note to fund expenses for the Projects as follows: (i) 3 Thornblade (owned by Houtex) in the amount of $467,635.43, (ii) 2203 Looscan in the amount of $20,000, and (iii) 415 Shadywood in the amount of $406,323.41.

- Houtex entered into a $500,000 line of credit from Spirit of Texas Bank (the "SOTB LOC") which had $483,754.90 principal and interest outstanding as of the date Houtex filed its voluntary petition for bankruptcy relief and such loan is secured by 3 Thornblade.[32]

- Houtex entered into a $387,254.71 loan from Great Southwest Financial Corp. ("GSFC") that is secured by 3 Thornblade.[33]

- The Petitioning Creditors entered into loans with Pensco Trust, Jim D and Nored, Hmaidan & Hmaidan as reflected in the deeds of trust admitted into evidence.[34]

       15.    The excess funding over the Equity Loan Amount is reflected in the following
chart:

---

[26]    Petitioning Creditors' Exhibit 2, Investor Agreement, § 8.
[27]    Petitioning Creditors' Exhibit 1, Investor Agreement, § 8.
[28]    Petitioning Creditors' Exhibit 4, Investor Agreement, § 8.
[29]    Petitioning Creditors' Exhibit 3, Investor Agreement, § 8.
[30]    Petitioning Creditors' Exhibit 6, bates 59-62.
[31]    Petitioning Creditors' Exhibit 7.
[32]    Petitioning Creditors' Exhibit 6, bates 58, 86-93, 97-115.
[33]    Petitioning Creditors' Exhibit 5.
[34]    Petitioning Creditors' Exhibit 38 (Jim D. Nored in the amount of $244,000 against 415 Shadywood), Exhibit 39 (Jim D. Nored in the amount of $118,650 against 415 Shadywood), Exhibit 40 (Hmaidan & Hmaidan, LLC in the amount of $783,000 against 2203 Looscan, Exhibit 41 (Pensco Trust Co. in the amount of $347,600 against 415 Shadywood), Exhibit 43 (Jim D. Nored in the amount of $339,000 against 5325 Lynbrook) and Exhibit 44 (Jim D. Nored in the amount of $90,640 against 5325 Lynbrook).

| Property | Equity Loan Amount | Third-Party Funding (principal amount) | Excess Funding Over Equity Loan Amount |
|---|---|---|---|
| 415 Shadywood | $405,000 | SOTB ($1.6MM) - $406,323.41<br>Pensoco Trust - $347,600<br>Jim D. Nored - $244,000<br>Jim D. Nored - $118,650<br>**Total: 1,1116,573.41** | **$711,573.41** |
| 2203 Looscan Lane | $638,625 | SOTB ($1.6MM) - $20,000<br>Hmaidan & Hmaidan, LLC - $783,000<br>**Total: $803,000.00** | **$119,375.00** |
| 3 Thornblade | $459,750 | SOTB ($1.6MM) - $467,635.43<br>SOTB (LOC) - $483,745.90<br>GSFC. - $387,254.71<br>**Total: $1,338.638.04** | **$878,886.04** |
| 5325 Lynbrook | $339,000 | Jim D. Nored - $339,000<br>Jim D. Nored - $90,640<br>**Total: $429,640.00** | **$90,640.00** |

16.     Section 8 of the Investor Agreements establish how the net proceeds of the sale of the Projects are to be distributed at closing.  Specifically, section 8 of the Investor Agreements provide:

> The title company is to distribute Net Proceeds as follows: First, Net Proceeds will be used to repay the outstanding balance of the [construction] Loan. Second, Net Proceeds will be used to repay Investor's equity of [a specified amount for each Project reflected in the chart above] (hereafter "Investor's Equity"). Third, Net Proceeds will be used to pay Investor $50,000.  Fourth, Net Proceeds will be used to pay 15% per annum interest on the Equity Loan.  Fifth, Net Proceeds will be used to pay [the Debtor] any amount it was required to provide under paragraph 6 of the Agreement. Sixth, Net Proceeds will be used to pay [the Debtor] $50,000.  All remaining Net Proceeds will be split equally between Investor and CD.  ***If Net Proceeds are less than the amount required to make the first through the sixth payments listed above, then [the Debtor] is to provide at closing the funds necessary to make up for the shortfall***.

Accordingly, the required payments under section 8 of the Investor Agreement include all the amounts required under section 6 of the Investor Agreement (*i.e.*, any funds over the construction loan and the Equity Loan) plus a $50,000 payment to the Petitioning Creditors.[35]

---

[35]     Petitioning Creditors' Exhibits 1, 2, 3 and 4, Investor Agreements, §§ 6, 8.

17.     It is undisputed that the Debtor did not come to the closing for 415 Shadywood, 2203 Looscan or 3 Thornblade with any funds.[36]   In other words, it did not come to closing with the additional funds required under section 6 of the Investor Agreement nor did it come to closing with the $50,000 payment to the Petitioning Creditor.

18.     The Debtor alleges that the Investor Agreements were modified to change the Equity Loan amount and to remove the obligation of the Debtor to pay $50,000 to the Petitioning Creditors.   However, the Debtor and its representative Mr. Parker are unable to identify the material terms of such modifications.

19.     With respect to the removal of the $50,000 payment, Mr. Parker stated: "I don't recall a discussion specifically of the $50,000."[37] The Petitioning Creditors contend that there were no modifications and the Debtor simply failed to meet their obligations to come to closing with the amounts it was required to pay under Section 8 of the Investor Agreement.

## LEGAL ARGUMENTS

### A.     The Failure to Check the Box in the Involuntary Petition is Not Dispositive

20.     The Court asked Petitioning Creditors to brief the question whether failing to check the box on paragraph 11 of the involuntary petition is dispositive.  The involuntary petition filed at ECF 23 amended the original involuntary petition at ECF 1.   The Court required the Petitioning Creditors to include a redline reflecting each change from the original involuntary petition.   The original involuntary petition correctly had the box checked in paragraph 11.   The redline showed no changes to this paragraph.   Therefore, the Debtor had actual knowledge of the election based on the redline attached to ECF 23.     There is no prejudice or harm to the Debtor for failing to check the box at ECF 23.  The Debtor did not raise this argument in its pleadings and did not raise

---

[36]     8/20/19 Hr. 61:7-12.
[37]     8/20/19 Hr. 65:2-3.

the argument until the second day of trial – approximately a month after the first day of trial.  The

Debtor waived this argument by failing to raise it in its pleadings and by failing to raise it during

the first day of trail.

**B.**      **No Bona Fide Dispute Exists Because Debtor Cannot Prove Enforceable Modifications To the Investor Agreements**

21.      The Debtor attempt to create a bona fide dispute as to liability by alleging that the

Debtor and the Petitioning Creditors orally modified the terms of the Investor Agreements.   The

Fifth Circuit has adopted an "objective standard" for determining whether a bona fide dispute

exists. *Matter of Sims*, 994 F.2d 210, 221 (5th Cir. 1993).  The Fifth Circuit applies the following

methodology when applying the objective standard:

> [T]he petitioning creditor must establish a prima facie case that no bona fide dispute
> exists. Once this is done, the burden shifts to the debtor to present evidence
> demonstrating that a bona fide dispute does exist. Because the standard is objective,
> neither the debtor's subjective intent nor his subjective belief is sufficient to meet
> this burden. The court's objective is to ascertain whether a dispute that is bona fide
> exists; the court is not to actually resolve the dispute. This does not mean that the
> bankruptcy court is totally prohibited from addressing the legal merits of the alleged
> dispute; indeed, the bankruptcy court may be required to conduct a limited analysis
> of the legal issues in order to ascertain whether an objective legal basis for the
> dispute exists. Finally, because the determination as to whether a dispute is bona
> fide will often depend ... upon an assessment of witnesses' credibilities and other
> factual considerations, the bankruptcy court's determination in this regard is a
> factual finding that may be overturned on appeal only if it is clearly erroneous.

**1.  Debtor Failed To Prove Alleged Modifications**

22.      "A modification of a contract must satisfy the elements of a contract: a meeting of

the minds supported by consideration." *Williams v. Colthurst*, 253 S.W.3d 353, 359 (Tex. App.—

Eastland 2008, no pet.) (citing *Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 228 (Tex. 1986)).

Whether a contract is modified depends on the parties' intentions and is a question of fact.  *Id.*

"When a party agrees to do no more than that which he is already bound to do under an existing

contract, the consideration is not sufficient to support a modification." *Arthur J. Gallagher & Co.*

*v. Dieterich*, 270 S.W.3d 695, 702 (Tex. App.—Dallas 2008).   The burden of proving modification rests on the party asserting the modification.  *Colthurst*, 253 S.W.3d at 359.

23.     Here, the Debtor has failed to meet its burden to demonstrate that there are oral modifications to the Investor Agreements.   The Debtor has not demonstrated that there was a meeting of the minds with respect to the material terms of such modifications.  When asked about the terms of the modifications, Mr. Parker testified: "As you asked earlier if there were, you know, when and what were the modifications. I don't recall the specifics."[38]   There cannot be a modification if the material terms of the modification are unknown.

24.     Furthermore, the Debtor did not establish that there was any consideration given for the alleged modifications.   Pursuant to the Contractor Agreements, the Debtor was to complete construction within twelve months of the commencement date.[39]   The Debtor argues that the Petitioning Creditors requested that the Debtor delay construction; however, this allegation is simply not credible as a delay would be no benefit to the Petitioning Creditors.  Mr. Foster testified it was the opposite and he was frustrated by the construction delays.[40]   The Debtors have not established what consideration the Petitioning Creditors received for assuming hundreds of thousands of liabilities that were the responsibility of the Debtors.

### 2.   Oral Modifications to the Investor Agreements Are Unenforceable

25.     Section 26.01 of the Texas Business and Commerce Code, known as the statute of frauds, provides, among other things, that an agreement for the sale of real estate is not enforceable unless the agreement is in writing and signed by the person to be charged with the agreement.  Tex. Bus. & Comm. Code § 26.01.

---

[38]     8/20/19 Hr. 64:19-21.
[39]     Petitioning Creditors' Exhibits, 1, 2 and 4, Contractor Agreements, § 2.
[40]     8/20/19 Hr. 85:9-10.

26.     The Investor Agreements are agreements for the sale of real property.  Sections 7 and 8 of the Investor Agreements discuss the closing of the sale of the Projects and how the title company is to handle the distribution of proceeds of such sale.  Because these Investor Agreements are agreements for the sale of real property, any oral modifications are not enforceable.  The Debtor admitted that the modifications were not in writing.[41]   Therefore, these alleged modifications are not enforceable and there is no basis for a bona fide dispute based on such modifications.

## C.      No Bona Fide Dispute Exists Because Each Petitioning Creditor Has Noncontingent, Undisputed Unsecured Claims of at Least $16,750

27.     Under Section 303(b) of the Bankruptcy Code, a creditor is an eligible petitioning creditor if it has noncontingent, undisputed unsecured claim in the amount of at least $16,750.[42] Here, each Petitioning Creditors has established that the Debtor owes them a noncontingent, undisputed unsecured claim in an amount of at least $16,750.

28.     "[E]ven if this Court were to find that there is some dispute as to a portion of [a petitioning creditor's] claim, it does not disqualify [the petitioning creditor] from filing the Involuntary Petition.  *In re CorrLine Int'l, LLC*, 516 B.R. 106, 150 (Bankr. S.D. Tex. 2014) (citing *In re TLC Med. Grp., Inc.*, No. 04–15739, 2005 WL 4677807, at *2 (E.D.La.2005) ("A dispute as to a portion of a claim does not disqualify a creditor from filing an involuntary petition.")).  It only matters if the dispute related to the claim has the potential to reduce the total amount of the petitioning creditors claim below the statutory threshold.  *In re DemirCo Holdings, Inc.*, 2006 Bankr. LEXIS 1131, 2006 WL 1663237; *see also* 2 Collier on Bankruptcy P 303.11 (16th 2019) ("[D]isqualifying a creditor because a portion of its debt is in dispute could curtail the ability of creditors to resort to a remedy Congress intended them to have.")

---

[41]     8/20/19 Hr. 35: 20-23.
[42]     This amount was adjusted on April 1, 2019.  84 FR 3488.

29.     Here, under the Investor Agreement, the Debtor guaranteed a minimum profit of $50,000 upon the sale of each Project.[43]  It is undisputed that the Debtor never paid this amount.[44]  This amount is sufficient for the Petitioning Creditors to be eligible petitioning creditors under Section 303(b) of the Bankruptcy Code.

30.     Under the Investor Agreements, the Debtor is also required to pay each Petitioning Creditor the amounts required under section 6 of the Investor Agreement, *i.e.*, the additional funds over and above the construction loans and the Equity Loans.   As set forth above, the amount of the additional funds in excess over the construction loan and the equity loan is $711,573.41 for 415 Shadywood, $119,375.00 for 2203 Looscan Lane and $969,506.04 for Houtex Builders, LLC (the addition of 3 Thornblade and 5325 Lynbrook).  It is undisputed that the Debtor never paid these amounts at closing as required under Section 8 of the Investor Agreements.[45]

31.     The Petitioning Creditors have demonstrated that they each have a noncontingent, undisputed unsecured claim in the amount of at least $16,750 against the Debtor.  Accordingly, there is no bona fide dispute as to the amount of the claims required for the commencement of the involuntary bankruptcy case.

### D.     Debtor Generally Does Not Pay Debts As They Become Due

32.     The Bankruptcy Code does not define the term "generally not paying" its debts.  Courts generally consider the following factors: the number of debts; the amount of the delinquency; the materiality of the nonpayment; and the nature and conduct of the debtor's business. *In re Bates*, 545 B.R. 183 (Bankr. W.D. Tex. 2016); *Murrin v. Hanson (In re Murrin)*, 477 B.R. 99, 107 (D. Minn. 2012); *In re Tarletz*, 27 B.R. 787 (Bankr. D. Colo. 1983).  Here, these

---

[43]     Petitioning Creditors' Exhibits 1, 2, 3 and 4, Investor Agreement, § 8.
[44]     8/20/19 Hr. 61:5-12.
[45]     8/20/19 Hr. 61:7-12.

factors heavily weigh in favor of finding that the Debtor is generally not paying its debts as they become due.

33.     First, with respect to the number of debts, the only debts that the Court has to consider in the record are the additional funds incurred in connection with the Projects and the failure to pay the required amounts in connection with the closings of the Projects.   There has been no showing of the number of other debts that the Debtor may be paying.  Even if the Debtor were paying small recurring creditors, bankruptcy courts throughout this circuit do not consider small recurring creditors in determining the number of creditors. *In re Smith,* 415 B.R. 222, 232 (Bankr. N.D.Tex. 2009) (citing *In re Moss,* 249 B.R. at 419; *Denham v. Shellman Grain Elevator, Inc.,* 444 F.2d 1376 (5th Cir.1971)). Therefore, the Court should exclude any small, recurring creditors.

34.     Second, with respect to the amount of the delinquency, the amounts are substantial. As noted above, the Debtor owes the Petitioning Creditors $50,000 for the guaranteed payment plus the additional funding amounts.   Accordingly, the Debtor owes the Petitioning Creditors, at a minimum, the following amounts - $761,573.41 for 415 Shadywood, $169,375.00 for 2203 Looscan Lane and $1,019,506.04 for Houtex Builders, LLC.  These amounts become due at the closing of the Projects which occurred in late 2018, in the case of 3 Thornblade, and early 2019, in the case of 415 Shadywood and 2203 Looscan Lane.

35.     Third, with respect to the materiality, "[t]he failure to pay just one significant creditor can support a finding that the debtor is generally not paying its debts." *In re Bates*, 545 B.R. 183, 190 (Bankr. W.D. Tex. 2016) (citing *In re Euro–Am. Lodging Corp.*, 357 B.R. 700, 713 (Bankr. S.D.N.Y.2007)).  The Debtor runs a homebuilding business.   As part of its business, it finds investors including the Petitioning Creditors to finance the building of the homes.   The

payments owed to the Petitioning Creditors under the Investor Agreement are significant in amount and relate directly to the Debtor's principal business activity – finding investors and building homes.

36.     Fourth, with respect to the nature and conduct of the Debtor's business, the record at the trial includes evidence that the Debtor is mismanaging its business.  For example, Mr. Parker admitted that he comingled funds among the different Projects.[46]  Such comingling makes it difficult to identify Debtor's breaches of the Investor Agreements.   Moreover, Debtor cannot account for funds it has received from investors.   For example, Mr. Parker admitted that Debtor took money from Jim Nored, but he did not know how much was borrowed, how much was owed, or even who knew the answers to these questions.[47]  Furthermore, Mr. Foster invested $4 to $5 million through an entity Lilly Charles Homes, but Debtor cannot account for where this money went.[48]

37.     Here, the factors clearly weigh in favor of finding that Debtor is not generally paying its debts as the come due.

   **E.     Purpose of the Involuntary Petition**

38.     The Court asked the Petitioning Creditors about the purpose of the involuntary petition.   As noted above, the Debtor is mismanaging funds.    It is not just the Petitioning Creditors' funds, but also mismanaging funds from other investors.   The Bankruptcy Court should oversee the process of monetizing Debtor's interests in its projects to ensure that the investors are fairly treated and compensated.

---

[46]     8/20/19 Hr. 60:20-21.
[47]     Petitioning Creditors Exhibit 8 Tr. 12:14-19:2.
[48]     8/20/19 Hr. 54:10-21; 84:16-21.

39.     Furthermore, the Petitioning Creditors will show to the Court in connection with the pending *Emergency Motion To Appoint a Chapter 11 Trustee* [ECF 3], that Anna Williams, Debtor's owner and the wife of Mr. Parker, has taken more than $5 million in membership distributions from September 2012 to August 2018.  Mr. Parker has alleged that these member draws are expense reimbursements; however, this does not make sense for a couple reasons.  First, the member draws are typically in even multiples of tens of thousands each.   Second, under the terms of the Investor Agreements, which appears to be the Debtor's form contract, the Debtor is responsible for any funds over the construction loans or the equity loans.   Accordingly, the Debtor would not be entitled to expense reimbursements.  The Bankruptcy Court should oversee the process of clawing back and avoiding these membership draws.

## **CONCLUSION**

WHEREFORE, the Petitioning Creditors respectfully request that this Court enter findings of facts and conclusions of law substantially in the form attached hereto and provide such other relief as is just and proper.

Dated: September 6, 2019                        Respectfully submitted,

DIAMOND McCARTHY LLP

*/s/ Charles M. Rubio*
Charles M. Rubio
TBA No. 24083768
crubio@diamondmccarthy.com
909 Fannin, 37th Floor
Houston, TX 77010
Telephone: (713) 333-5100
Facsimile: (713) 333-5199

*Counsel to the Petitioning Creditors*