## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HL BUILDERS, LLC f/k/a** | § | **CASE NO.  19-32825** |
| **CD HOMES, LLC,** | § | |
| | § | **(Involuntary Chapter 11)** |
| **ALLEGED DEBTOR** | § | |

### HL BUILDERS' BRIEF IN RESPONSE TO
### THE PETITIONING CREDITORS' BRIEF IN SUPPORT OF
### INVOLUNTARY PETITION

TO THE HONORABLE EDUARDO V. RODRIGUEZ,
UNITED STATES BANKRUPTCY JUDGE:

Comes now, HL Builders, LLC f/k/a CD Homes, LLC, the Alleged Debtor herein ( *"HL Builders"*) and files this Brief in Response to the Petitioning Creditors' Brief in Support of Involuntary Petition (the *"Petition"*) filed by HouTex Builders, LLC, 415 Shadywood, LLC, and 2203 Looscan Lane, LLC (the *"Foster Entities"*), and in support thereof, would respectfully show this Court as follows:

### Introduction

The Foster Entities are special-purpose entities formed and owned by Charles Foster to own, build and then sell one or more residential properties.  The Foster Entities filed the Petition against HL Builders on May 20, 2019 and amended their petition on July 11, 2019.  The Foster Entities are themselves admittedly insolvent voluntary Chapter 11 debtors in the jointly administered Case Number 18-34658, *In re Hou-Tex Builders, et al.,* pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (collectively, the *"Foster Entities' Bankruptcy"*).  HL Builders is owed $1.7 million by the Foster Entities.  The issue of who owes what to whom is and has been a matter of continuing dispute between the parties.

The Foster Entities filed the Petition in bad faith, using the bankruptcy court as a club against HL Builders in retaliation for HL Builders pursuing its substantial claims in the Foster Entities' Bankruptcy and impeding otherwise unopposed Chapter 11 reorganizations.[1]

Involuntary bankruptcies provide a harsh remedy and courts do not permit them lightly. The Petition failed to meet the jurisdictional requirements of Section 303 of the Bankruptcy Code by omitting a key allegation, that the debtor has failed to generally pay its undisputed debts as they become due. The absence of that allegation deprives this Court of subjection matter jurisdiction and, because it is a question of subject matter jurisdiction, HL Builders could not and did not waive the deficiency.

Even if the Foster Entities could remedy their jurisdictional failure, they lack standing to file this involuntary petition because the claims they assert to support their petition do not constitute the sort of liquidated and undisputed claims contemplated by Section 303. Instead, *bona fide* disputes exist between the parties as to who has liability under the Agreements between them, whether those Agreements were modified and what effect those modifications have on the claims, and the amounts claimed as damages. Section 303 does not permit a petitioner to file an involuntary bankruptcy based upon claims as to which a *bona fide* dispute exists.

As a result, the Court must dismiss the involuntary bankruptcy. Additionally, the Court can and should award HL Builders its damages and sanctions against Charles Foster, the Foster Entities, and their officers, agents and attorneys for filing the involuntary petition in bad faith.

---

[1]     Dkt. No. 338 - Judge Jeffrey Norman's Order on Amended Disclosure Statement in Foster Entities' Bankruptcy Proceeding, page 4; lines 1-21 in Case No. 18-34658; *In re: Houtex Builders, LLC, et al.; 415 Shadywood, LLC;* Case No. 18-34659; *415 Shadywood, LLC;* Case No. 18-34660; 2203 Looscan Lane, LLC; Jointly Administered

**The Foster Entities Lack Standing Because a Bona Fide Dispute Exists
<u>as to Liability and Amount of any Damages under the Claims</u>**

A petitioning creditor does not have standing to petition for involuntary bankruptcy when a *bona fide* dispute exists as to its claim.[2]   Under section 303 of the Bankruptcy Code, an involuntary petition may be brought only by the *"holder of a claim ... that is not ... the subject of a bona fide dispute as to liability or amount."*[3]

In considering whether a *bona fide* dispute as to liability or amount exists, the Fifth Circuit has held that the bankruptcy court "must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt."[4]   In turn, the determination of whether a dispute is bona fide will often depend upon an assessment of witnesses' credibility and other factual considerations.[5]

## <u>The Prior Profitable Relationship and Agreements</u>

Before the Foster Entities filed for bankruptcy protections, they engaged in a long and profitable relationship with HL Builders building and selling residential homes on a build-one and sell-one basis.[6]   In prior deals, the parties used HL Builders' standard contractor, investor and option agreements, which included terms virtually identical with those contained in the Agreements made the basis of this dispute, by which Charles Foster personally guaranteed the construction loan

---

[2]     *In re Nordbrock,* 772 F.2d 397, 399 (8th Cir. 1985).

[3]     11 U.S.C. § 303(b)(1).

[4]     *In re Sims,* 994 F.2d 210, 221 (5th Cir. 1993) (citing *In re Rimell,* 831 F.2d 745, 750 (7th Cir. 1991)).

[5]     *In re Rimell,* 946 F.2d 1363, 1365 (8th Cir. 1991).

[6]     7/16/2019 Hr. 76: 23-25; 7/16/2019 Hr. 77: 1-10; 7/16/2019 Hr. 78: 3-10.

and funded the equity required for the project.   The parties' prior projects were consistently profitable.[7]

### The Leveraged Projects and the Modified Agreements

The record establishes by a preponderance of the credible evidence that the claims relied upon by the Foster Entities are the subject of *bona fide* dispute because the Agreements were materially modified.  In 2013 and 2014, Charles Foster sought to increase his profits by leveraging both the number and market value of new projects undertaken with HL Builders.

These projects included those now in dispute -- the Shadywood, Lynbrook, Thornblade and Looscan properties (the ***"Leveraged Projects"***).   Although the parties signed the standard Agreements (the ***"Agreements"***) for each of the Leveraged Projects,[8] the deal format had so fundamentally changed that the Agreements, absent modification, were unworkable.    The Agreements were materially modified with respect to the Leveraged Projects as follows:

    i)       equity was no longer funded by Charles Foster, but by third parties;

    ii)      construction on certain projects never began; instead Foster demanded their liquidation;

    iii)     construction on other projects was delayed well beyond twelve months while Foster awaited a market recovery;

    iv)     the construction lender was modified after the Agreements were executed; and

    v)      Charles Foster personally became deeply involved in the projects' decision-making even to the extent that he reviewed all invoices and wrote all checks.

---

[7]   7/16/19 Hr. 76: 23-25; 7/16/19 Hr. 77: 1-10; 7/16/19 Hr. 78: 3-10.

[8]   Foster Entities' Exhibits 1, 2, 3, and 4.

4

**Equity Funding Modification from Charles Foster to Third Parties**

Critically, Charles Foster (**"*Foster*"**) never funded the equity component of the Leveraged Projects as had been the previous agreement of the parties. Instead, the parties materially modified the Agreements to meet the substantially increased equity dollars required for the multiple high-end Leveraged Projects in view of Foster's financial constraints. To this end, Foster tasked HL Builders with locating alternate equity funding sources and HL Builders did so by arranging third party funding with the Spirit of Texas bank, Robert Parker's in-laws and Jim Nored.[9] Foster acknowledged he never wrote checks for his equity contributions for the Leveraged Projects in dispute.[10]

The parties' revised agreement to modify equity funding for the Leveraged Projects massively altered the economic equation. Foster, relieved of his obligation to personally fund the significantly increased equity for the high-end residential projects, also forfeited his right to reap the full economic benefit previously awarded under the original deal structure. The delayed construction of projects caused additional and prohibitive project carrying costs – property taxes, insurance and accrued interest – resulting in enormous financial losses on the projects.

Foster contends that he provided $4 million in equity for the Green Tree and Longmont projects and "believed" that his $4 million invested in the Green Tree and Longmont projects would serve as his required equity contribution on the Leveraged Projects.[11] That contention is not memorialized in the Agreements relied upon by the Foster Entities in support of their claims and

---

[9]     8/15/19 Hr. 42: 14-23; 8/15/19 Hr. 43: 7-14.

[10]     8/20/19 Hr. 84:13-16.

[11]     7/16/19 Hr. 81: 25; 7/16/19 Hr. 82: 1-2; 8/20/19 Hr. 84: 13-18.

there is no evidence of any meeting of the minds with HL Builders of Foster's imagined treatment. Rather, there is credible evidence that Foster requested HL Builders to obtain alternative sources of equity funding when Foster ran out of money.[12]

Moreover, the facts evidence the impossibility of Foster's equity funding contention. The Green Tree project was purchased in July 2013 and sold in February 2016. The Longmont project was purchased in June 2013 and sold in January 2017. The Leveraged Projects in dispute were purchased in 2013 and 2014 – *several years* before equity from the sale of the Green Tree and Longmont projects could be available for other projects. In reality, Foster's contention that he funded the equity component of the Leveraged Projects using equity from the prior projects is not contained within the four-corners of the Agreements and lacks credibility and supporting evidence.

### Equity was Funded by Spirit of Texas Bank and Others, not Charles Foster

The record reflects that the Leveraged Projects were funded by sources obtained by HL Builders at Foster's instruction and with his knowledge and consent. Robert Parker testified in detail how the $1.6 million Spirit of Texas loan proceeds were used only to fund equity requirements or reimburse lender approved construction expenditures of the projects.[13] Further, the Foster Entities' Exhibit 7, relied upon as their exclusive basis for filing the Petition, summarizes the manner in which the Spirit of Texas funds were used to satisfy equity requirements for each project.[14] In other words, the Foster Entities baldly assert – without supporting evidence – that the Spirit of Texas indebtedness was HL Builders' liability because those funds were not used for either construction

---

[12]    8/15/19 Hr. 38: 24-25; 8/15/19 Hr. 39: 1-2.

[13]    8/20/19 Hr. 57: 20-22; 8/20/19 Hr. 59: 9-17; 8/20/19 Hr. 60: 5-6; 8/20/19 Hr. 61: 3-9.

[14]    7/16/19 Hr. 101: 19-25.

or equity components of the projects.  In truth, the record reflects that equity components of the Leveraged Projects were funded by the Spirit of Texas loan and others,[15]  although the Agreements as written required the Foster Entities to fund equity.[16]

### Additional Modifications Included Project Liquidation and Construction Delay

Unfortunately, after Foster had leveraged up with multiple and larger dollar projects,[17] the price of oil collapsed by late 2014 and into 2015 and Foster realized he may have gotten in too deep.[18]  Thereafter, the meetings between Foster and HL Builders' representative, Robert Parker, became progressively more frequent.[19]  Ultimately, Foster took control over the day-to-day project activities including review and direct payment of each invoice.[20]

Most importantly, Foster further materially changed the deal structure through two key ultimatums.  First, he forced the sale of undeveloped projects rather than completing the construction in accordance with the written terms of the Agreements.[21]   This deprived HL Builders  – as the contractor – of the benefit of its bargain.  Foster admitted he decided to liquidate several projects before development and testified, *"I wanted to sell those, yes, desperate, at some point when it looked like it was going to be all of these were disasters."*[22]

---

[15]   8/20/19 Hr. 57: 20-22; 8/20/19 Hr. 59: 9-17; 8/20/19 Hr. 60: 5-6; 8/20/19 Hr. 61: 3-9.

[16]   Foster Entities' Exhibits 1, 2, 3, and 4; Investor Agreement; Sections 6, 8.

[17]   8/15/19 Hr. 35: 6-20; 8/15/19 Hr. 36: 2-16.

[18]   8/15/19 Hr. 37: 12-21.

[19]   8/15/19 Hr. 38: 11-14.

[20]   8/15/19 Hr. 37: 22-24;  8/15/19 Hr. 38: 11-20; 8/15/19 Hr. 39: 5-16.

[21]   7/16/19 Hr. 94: 4-6;  7/16/19 Hr. 102: 8-15.

[22]   7/16/19 Hr. 102: 8-20.

Second, and equally critical, after the market drop, Foster changed the deal by instructing HL Builders to significantly delay construction on projects over the strenuous objection of Robert Parker.[23]   The substantial construction delay resulted in enormous and financially devastating carrying costs – property taxes, insurance, interest – and eventually caused a loss of upwards of two million dollars combined on only two of the projects.[24]

### Foster Entities Could Not State Actual Damages Amount

In their amended involuntary petition, the Foster Entities allege breach of contract damages of $2.3 million.[25]   Tellingly, the Foster Entities themselves could not state the actual dollar amount of their asserted claims against HL Builders when they rested their case-in-chief.[26]   The claim amounts sworn to by Foster under penalty of perjury in the amended involuntary petition[27]   differed from the amounts alleged as owing during trial.[28]   By their own conflicting evidence, the amount of damages the Foster Entities seek by reason of their claims is the subject of a *bona fide* dispute and does not support the filing of the Petition.

### Bona Fide Dispute concerning Foster Entities' Liability and HL Builders' Damages

Based upon the parties' modified Agreements, HL Builders expended $1.7 million on the Leveraged Projects during the extended construction delay and filed its proofs of claim against the

---

[23]     8/20/19 Hr. 41: 3-10.

[24]     8/15/19 Hr. 46: 6-12; 8/20/19 Hr. 41: 24-25; 8/20/19 Hr. 42: 1-4.

[25]     Dkt. 23 - Amended Involuntary Petition, ¶ 13.

[26]     8/20/19 Hr. 102: 18-25; 8/20/19 Hr. 103: 1-5.

[27]     Dkt. 23 - Amended Involuntary Petition, ¶ 13.

[28]     8/20/19 Hr. 102:18-25; 8/20/19 Hr. 103: 1-5.

Foster Entities' in their respective bankruptcy proceedings.[29]   Those proofs of claim remain pending and arise from the same transactions made the basis of the Foster Entities' claims in this involuntary proceeding.   HL Builders offered credible evidence at trial that it is the Foster Entities who owe HL Builders $1.7 million after the parties' relationship ended.[30]   As a result, a *bona fide* dispute exists as to the liability and amount of damages owed by the Foster Entities to HL Builders.

### The Foster Entities Rely on Terms Taken Out of Context from the Pre-Modified Agreements

To support their involuntary petition claims against HL Builders, the Foster Entities rely upon two isolated paragraphs taken out of context from the Agreements as originally written and subsequently modified.

Para. 6      Investor and CD agree that if funds are required to make any payments that exceed the sum of Investor's equity, as defined below, and the Loan, all such funds are to be provided by CD.

Para. 8      The title company is to distribute Net Proceeds as follows: First, Net Proceeds will be used to repay the outstanding balance of the Loan.  Second, Net Proceeds will be used to repay the equity loan of $405,000 (hereafter the "Equity Loan").[31]  Third, Net Proceeds will be used to pay Investor $50,000. Fourth, Net Proceeds with be used to pay 15% per annum interest on the Equity Loan. Fifth, Net Proceeds will be used to pay CD any amount it was required to provide under paragraph 6 of the Agreement. Sixth, Net Proceeds will be used to pay CD $50,000.  All remaining Net Proceeds will be split equally between Investor and CD.  If Net Proceeds are less than the amount required to make the first through the sixth payments listed above, CD is to provide at closing the funds necessary to make up for the shortfall.

In essence, the Foster Entities ask the Court to grant them the benefits of selected contractual

---

[29]      HL Builders' Exhibits 1 - 9; 8/20/19 Hr. 98: 19-25; 8/20/19 Hr. 99: 1-6.

[30]      8/15/19 Hr. 72: 17-25; 8/15/19 Hr. 73: 1-7.

[31]      Foster Entities' Exhibits 1, 2, 3 and 4, Investor Agreement, Section 8:  Shadywood Project Equity: $405,000; Looscan Project Equity:  $638,625; Thornblade Project Equity:  $459,750; Lynbrook Project Equity:  $339,000.

provisions before the Agreements were modified, but allow them to ignore provisions favoring HL Builders.  The Texas Supreme Court has noted that, "[c]ontext is important, so we must consider the entire writing and will endeavor to harmonize and give effect to all provisions so that none are rendered meaningless."[32]   Contract terms cannot be viewed in isolation because to do so distorts a contract's meaning.[33]  No one phrase, sentence, or section of the agreement should be isolated from its setting and considered apart from the other contractual provisions.[34]

The Agreements were either maintained in tact or they were modified.  The Foster Entities cannot have it both ways.  If they contend that the Agreements were never modified, then the Foster Entities breached the Agreements by failing to fund the equity component.[35]   In fact, the circumstances and credible testimony in this case overwhelmingly demonstrate that the parties modified the Agreements from the outset.  More to the point and at a minimum, a *bona fide* dispute exists that deprives the Foster Entities of the standing they need to maintain this involuntary petition.

### Credibility Issues

The determination of whether a dispute is *bona fide* will often depend upon an assessment of witnesses' credibility and other factual considerations.[36]   In this case, the Court has heard the conflicting testimony of Robert Parker and Charles Foster concerning modifications of the Agreements.

Robert Parker testified at length concerning the rationale underlying the modifications

---

[32]     *Exxon Mobil Corp. v. Ins. Co. of State,* 568 S.W.3d 650, 657 (Tex.)

[33]     *Pathfinder Oil & Gas, Inc. v. Great Western Drilling, Ltd.,* 574 S.W.3d 882, 888 (Tex. 2019).

[34]     *Id.*

[35]     Foster Entities' Exhibits 1, 2, 3 and 4, Investor Agreement, Sections 6, 8.

[36]     *In re Rimell,* 946 F.2d 1363, 1365 (8th Cir. 1991).

including the significant economic downturn,[37] the parties' numerous discussions and actions which occurred after the parties' original agreements,[38] the change in the structure of equity funding to sources other than Foster,[39] Foster's instruction to sell the Crab Orchard and Bordley projects,[40] and the delay imposed by Foster upon HL Builders' construction efforts resulting in substantial carrying costs and losses,[41] all of which constitute substantial modifications to the Agreements. Parker's testimony rationally and factually explained the drastic changes in the parties' circumstances that necessitated and justified the material modifications to the Agreements.

In contrast, although Foster testified adamantly that the Agreements were never modified, his testimony concerning multiple facets of the Leveraged Projects – including modification of the Agreements – lacks credibility. Foster is a sophisticated attorney who has practiced law for more than 40 years.[42] Beginning in 2006, he began working with CD Homes, represented by Robert Parker, in the home-building business on multiple projects.[43] Despite his sophistication and residential real estate experience, he testified he was unaware of the nature of the many legal documents he signed and was uncertain as to how project funds were spent. Nor did he know the bankers or attend closings on the projects.

Foster testified that, *"He [Robert Parker] would call and come to the office and I'd get –*

---

[37]   7/16/19 Hr. 92: 19-20.

[38]   8/15/19 Hr. 37: 12-25; 8/15/19 Hr. 38: 11-14; 8/15/19 Hr. 39: 5-14.

[39]   8/15/19 Hr. 43: 7-14.

[40]   7/16/19 Hr. 102: 8-22.

[41]   8/20/19 Hr. 46: 6-12.

[42]   7/16/19 Hr. 115: 14-15.

[43]   7/16/19 Hr. 22: 11-12.

*my receptionist would say he's in the conference room right off the main reception area and I would go in and he would have documents and we chat about UT football and I'd sign the documents.*"[44] He contends Parker *"would ask me to sign documents, those little yellow things, and I would sign them.*"[45]

When asked whether he guaranteed the loan at Spirit of Texas Bank, Foster testified, *"Apparently so."* [46]  He testified that he guaranteed the $1.6 million Spirit of Texas loan which provided equity money but thought it was *"a renewal or modification of an existing construction loan."*[47]  He testified he was unaware that he had signed a guaranty for the $1.6 million note.[48]  He denied knowing the bankers involved in the Leveraged Projects[49] and denied attending closings.[50]  He testified that he became a special lender on two projects but never executed a deed of trust or construction loan.[51]   Foster's positions of incredulity and naivete concerning the fundamentals  of his own multi-million dollar ventures in this dispute are untenable.  Likewise, his testimony that the parties never modified the Agreements lacks credibility and should be disregarded.

In their brief, the Foster Entities deny that Foster instructed HL Builders to delay construction of the projects and reason that such a request *"would make no sense because the Foster Entities*

---

[44]      7/16/19 Hr. 112: 6-10.

[45]      8/20/19 Hr. 87: 13-15.

[46]      7/16/19 Hr. 88: 18-20.

[47]      7/16/19 Hr. 97: 19-24.

[48]      7/16/19 Hr. 112: 11-15.

[49]      8/20/19 Hr. 87: 20-21.

[50]      8/20/19 Hr. 88: 22-23.

[51]      7/16/19 Hr. 95:6-7, 10-12.

*would only realize a profit upon a sale of the Projects and therefore would want the Projects constructed and sold as quickly as possible."* [52]

The same rationale applies to HL Builders in that it was to the mutual financial benefit of the parties to complete construction within the twelve month period, as the delay was also to HL Builders's substantial financial detriment.[53]   HL Builders had no financial incentive to delay completion of the projects because net proceeds were to be split evenly upon sale of the completed projects.[54]

Importantly, the Foster Entities did not terminate the Agreements or allege breach of contract for the extended delay in construction, but continued their relationship with HL Builders.  Nor did the Foster Entities terminate the Agreements when money was not returned to Charles Foster or the Foster Entities at prior project closings.[55]   Instead, as testified to in considerable detail by Robert Parker, the deal had materially changed by mutual consent and a *bona fide* dispute exists as to both liability and amount of any debt owed by HL Builders to the Foster Entities.

## The Statute of Frauds is Inapplicable

The Foster Entities advise the Court – without any authority – that the Agreements constitute contracts for the sale of land and are, therefore, subject to the Statute of Frauds, which would prohibit any modifications without a signed writing.  This forms the linchpin of the Foster Entities' argument that no *bona fide* dispute exists as to whether the parties modified the Agreements, orally

---

[52]   Dkt. No. 46 - Foster Entities' Brief in Support of Involuntary Petition, p. 3, para. 7.

[53]   8/20/19 Hr. 41: 17-24.

[54]   Foster Entities' Exhibits 1, 2, 3 and 4, Investor Agreement, Section 8.

[55]   8/15/19 Hr. 62: 14-25.

or by their conduct.

This argument fails for multiple reasons.  First, none of the Agreements constitute a *"contract for the sale of real estate,"* as required by the Statute.[56]   The Agreements do not by any stretch of the imagination provide for the sale or conveyance of the real property by and between the parties as seller and purchaser, nor do they contain the sales price or any other material terms for sale of the real property by Investor, as record title owner, to a third party.

The contractor agreement provided that HL Builders *shall construct* the single family residence upon real estate already owned by the Foster Entities.[57]   The investor agreement provided that HL Builders will help *build and market* a single family residence and described the manner in which the net proceeds from the sale of each residence would be distributed at closing.[58]   Paragraph 6 of the investor agreement merely provides, *"At closing of the sale of the Property to a bona fide third party purchaser, Investor and CD agree that the title company is to be instructed to disburse the net proceeds as set forth in paragraph 8 of the Agreement."* [59]   Because the Agreements were not contracts for the sale of real estate, they were not governed by the Statute of Frauds and written modifications were not necessary.

Second, the Agreements did not include an entireties clause or any other requirement that

---

[56]   TEX. BUS. & COM. C. § 26.01(a) provides:  "A promise or agreement described in Subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is (1) in writing; and (2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him."

TEX. BUS. & COM. C. § 26.01(b) provides: "Subsection (a) of this section applies to:  ... (4) a contract for the sale of real estate ..."

[57]   Foster Entities' Exhibits 1, 2, 3 and 4; Contractor Agreement, Section 1

[58]   Foster Entities' Exhibits 1, 2, 3 and 4, Investor Agreement, Introductory Paragraph and Section 8.

[59]   Foster Entities' Exhibits 1, 2, 3 and 4, Investor Agreement, Section 6.

modifications of the agreement be in writing and signed by all parties.   As a result, the parties could and did modify the Agreements orally and by their conduct; the evidence demonstrated that they did and that a *bona fide* dispute between the parties does exist.

Third, the Foster Entities' expansive view of the statute of frauds stands against the plain language of the statute, which only applies to *"a contract for the sale of real estate,"* and against well-settled Texas law interpreting that statute.   As an example, the Texas Supreme Court has held that an agreement to buy land jointly does not fall within the statute of frauds.[60]

In summary, the Agreements represent Charles Foster, the Foster Entities and HL Builders' intent to work  together to build high-end residential homes on land owned by the Foster Entities, to market them for sale and to distribute net proceeds upon an agreed formula at closing.   The Agreements do not constitute "contracts for the sale of real estate."   Accordingly, neither the Agreements themselves nor any modifications thereto are governed by the statute of frauds.

### The Court Must Dismiss the Petition Because the Foster Entities Failed to Assert a Key Jurisdictional Allegation: the Debtor is Not Generally Paying Debts as They Become Due

The Court must dismiss the Petition because the Foster Entities failed to meet the jurisdictional requirements of Section 303 of the Bankruptcy Code.   The filing of an involuntary bankruptcy petition should be reviewed strictly for good reason, as the Fifth Circuit has acknowledged:

> An allegation of bankruptcy invokes remedies not available to any ordinary debt collection procedures.   It should not be invoked unadvisedly and contrary to statutory right.[61]

---

[60]   *Gardner v. Randell,* 70 Tex. 453, 7 S.W. 781, 782 (Tex. 1888); *Reid v. Howard,* 71 Tex. 204, 9 S.W. 109, 110 (Tex. 1888); *James v. Fulcrod,* 5 Tex. 512, 1851 WL 3915, at *3 (1851).

[61]   *In re Walden,* 781 F.2d 1121, 1123 (5th Cir. 1986).

The Foster Entities filed a form petition through which the filing party denotes certain allegations through a "checked box" notification.  In their live pleading,[62] however, the Foster Entities failed to check the box required to establish the jurisdictional basis for filing an involuntary petition.  By failing to check the box under Part 3, No. 11 of the Petition, the Foster Entities failed to declare under penalty of perjury that *"debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount."*

As a result, the Foster Entities  failed to satisfy the minimum jurisdictional requirements for filing an involuntary petition against HL Builders.   The failure to check the box is dispositive as to the Foster Entities' standing to bring the Petition because the allegation is a mandatory component of the Petition.[63]  The Foster Entities' omission is fatal because a bankruptcy court lacks jurisdiction to enter relief against the debtor absent a debtor's failure to generally pay its undisputed debts as they become due.[64]

HL Builders has not located a case squarely on point.   In a similar fact pattern, however, a petitioning creditor failed to check a box on an involuntary petition indicating that the claim had been transferred to him.[65]  There, the petitioning creditor made no attempt to seek leave of court or alleged debtor's consent to amend the involuntary petition, but filed an "addendum" in an attempt to correct the deficiency.   The *Clignett* court disallowed the petitioning creditor's action as an untimely "amendment" and dismissed the involuntary petition.

---

[62]   Dkt. No. 23 - Amended Involuntary Petition Against a Non-Individual

[63]   Official Form 205 - Involuntary Petition Against a Non-Individual:
Part 3, No. 11.  Allegations: *"At least one box **must** be checked:"  (emphasis added).*

[64]   11 U.S.C. § 303(h)(1)

[65]   *In re Clignett,* 567 B.R. 583, 586-587 (Bankr.C.D. Cal. 2017).

In the instant dispute, HL Builders has not consented to any amendment nor did the Foster Entities seek leave of court to correct their defective Petition prior to trial.[66]  "It is well-settled that objections to subject matter jurisdiction may be made at any time, and may even be raised and decided by the Court on its own motion if the parties overlook or elect not to press such an objection."[67]  The Foster Entities' failure to satisfy the jurisdictional requirements of Section 303 requires dismissal of the Petition.

### The Bankruptcy Court's Equitable Powers Cannot Save the Petition

Section 105(a) of the Bankruptcy Code provides that the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  However, bankruptcy courts may not use their equitable powers to enter any necessary or appropriate orders if to do so would strip another Bankruptcy Code provision of its meaning.[68]  Further, a bankruptcy court's broad equitable powers do not allow it to override explicit mandates of other sections of the Bankruptcy Code.[69]  Accordingly, the Foster Entities' failure to allege under penalty of perjury that HL Builders is *generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount*  cannot be cured by the exercise of the court's equitable powers under Section 105 of the Bankruptcy Code because it would be inconsistent with the express mandate of Section 303(h)(1) as implemented under Part 3, No. 11 of Official Form 205 requiring the Foster Entities to check the box under penalty of perjury in order to invoke the jurisdiction of the

---

[66]     Hearings on Involuntary Petition held on July 16, 2019, August 15, 2019 and August 20, 2019.

[67]     *In re Mid-South Business Associates, LLC,* 555 B.R. 565, 570 (Bankr.N.D. Miss. 2016) (citing *Henderson v. Shinseki,* 562 U.S. 428, 434-35, 131 S.Ct. 1197, 179 L.Ed.2d 159 (2011)).

[68]     *In re WAPI, Inc.,* 171 B.R. 130, 133 (Bankr.N.D. Ala. 1994).

[69]     *In re Sec. & Energy Systems, Inc.,* 62 B.R. 676, 678 (Bankr.W.D.N.Y. 1986).

bankruptcy court.[70]

### The Court Must Dismiss the Involuntary Petition and Should Award Fees and Sanctions

The foregoing demonstrates that the Court must dismiss the Foster Entities' involuntary petition for lack of subject matter jurisdiction and lack of standing, as a result of the *bona fide* dispute that exists as to their claims.  When the court dismisses an involuntary petition other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment, the court may grant judgment against the petitioners and in favor of the debtor for costs or a reasonable attorney's fee; or, against any petitioner that filed the petition in bad faith, for any damages proximately caused by the filing or punitive damages.[71]

Foster testified that the Foster Entities filed the Petition against HL Builders to collect money owed to them.[72]  An allegation of bankruptcy invokes remedies not available to any ordinary debt collection procedures.  It should not be invoked unadvisedly and contrary to statutory right.[73]  Foster intentionally misused the involuntary bankruptcy mechanism – rather than utilizing ordinary debt collection procedures – to collect the purported but highly disputed debt from HL Builders.  Other indicia of bad faith by Foster and his entities in filing the involuntary petition at issue in this proceeding are as follows:

      a)      the lack of valid, undisputed claims to support the filing;

---

[70]    *Id.*; Official Form 205 - Involuntary Petition Against a Non-Individual: Part 3, No. 11.  Allegations: "*At least one box **must** be checked:*"  (emphasis added).

[71]    11 U.S.C. § 303(i)(1),(2).

[72]    7/16/19 Hr. 105: 2-16.

[73]    *In re Walden,* 781 F.2d 1121, 1123 (5th Cir. 1986).

b)      the failure to check-the-box on the amended petition that debtor is generally not paying its undisputed debts as they become due;

c)      the Foster Entities are themselves notoriously insolvent debtors;

d)      the Foster Entities' motion to consolidate HL Builders' involuntary bankruptcy proceeding with the Foster Entities' Bankruptcies;

e)      the Foster Entities' motion to appoint a trustee in HL Builders' involuntary bankruptcy proceeding (thus attempting to oust HL Builders' opposition to the Foster Entities' Bankruptcy);

f)      the Order entered by Judge Norman in the Foster Entities' Bankruptcy that  HL Builders has been the only party opposing the Foster Entities' conduct of their proceedings;

g)      Counsel for the Foster Entities are very experienced bankruptcy attorneys;

h)      the principal of the Foster Entities is a sophisticated, board certified attorney who is the only person who stands to benefit from the proposed plans filed by the Foster Entities in their chapter 11 bankruptcy proceedings; and

i)      the Foster Entities' involuntary petition against HL Builders, absent punishment for bad faith filing, leaves HL Builders without the possibility of recovering its damages resulting from by the conduct undertaken by Charles Foster, the Foster Entities, and their attorneys.

Neither Foster nor his entities should be allowed to litigate their *bona fide* disputes with HL Builders under the guise of an involuntary bankruptcy petition, especially when filed in bad faith. Involuntary bankruptcy is a severe remedy and can only be permitted when the statutory requirements of Bankruptcy Code Section 303 have been met.[74]   "The filing of an involuntary petition is an extreme remedy with serious consequences to the alleged debtor, such as loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment."[75]

---

[74]      *In re Norriss Bros. Lumber Co., Inc.,* 133 B.R. 599, 608 (Bankr.N.D. Tex. 1991).

[75]      *In re Reid,* 773 F.2d 945, 946 (7th Cir. 1985).

WHEREFORE, PREMISES CONSIDERED, HL Builders prays that the Court dismiss the Petition, enter findings of fact and conclusions of law substantially in the form attached hereto, and retain jurisdiction to award appropriate damages against Charles Foster, the Foster Entities and their officers, agents, and attorneys for damages to HL Builders proximately caused by the bad faith filing pursuant to 11 U.S.C. § 303(i)(2).

Dated: September 30, 2019

Respectfully submitted,

FUQUA & ASSOCIATES, PC

BY:      /s/ Richard L. Fuqua
Richard L. Fuqua
State Bar No. 07552300
5005 Riverway, Suite 250
Houston, TX 77056
(713) 960-0277
(713) 960-1064 facsimile
rlfuqua@fuqualegal.com
Counsel for HL Builders

20