

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
02/18/2020

| | | |
|---|---|---|
| IN RE: | § | |
| **HL BUILDERS, LLC; aka CD HOMES, LLC** | § | **CASE NO: 19-32825** |
| | § | |
| **Target Debtor** | § | |
| | § | **CHAPTER 11** |

### <u>MEMORANDUM OPINION</u>

Well-advised creditors have reason to be circumspect in filing an involuntary petition.  In order to successfully force a debtor into bankruptcy, a petitioning creditor, inter alia, must establish that its particular claim is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, that its unsecured claims aggregate at least $16,750, and must demonstrate that the target debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount.  If unsuccessful, a petitioning creditor may find itself at the receiving end of an adverse award of attorney's fees, costs, and damages.

On May 20, 2019, HOUTEX Builders, LLC ("*Houtex*"), 2203 Looscan Lane, LLC ("*Looscan Lane*"), and 415 Shadywood, LLC ("*Shadywood*"), (collectively, "*Petitioning Creditors*") filed an involuntary petition against HL Builders, LLC, formally known as CD Homes, LLC ("*Target Debtor*").  The involuntary petition was subsequently amended on July 11, 2019 and is currently the live pleading before the Court ("*Amended Involuntary Petition*").  This Court conducted a trial over three days commencing July 16, 2019 and concluding on August 21, 2019.  For the reasons stated herein, the Court finds that Petitioning Creditors did not have standing to file the Amended Involuntary Petition.  Although Petitioning Creditors' claims meet the statutorily required $16,750 in amount, Houtex's claim with respect to 5325 Lynbrook,

Houston, Texas 77056 is contingent as to liability. Nevertheless, each of Petitioning Creditors' claims are the subject of a bona fide dispute as to liability and amount of the claims. Additionally, Petitioning Creditors failed to demonstrate that Target Debtor is generally not paying its debts as they become due. Therefore, an order for relief will not be entered on the Amended Involuntary Petition, and the case is dismissed. Reasonable and necessary attorney's fees and costs will be awarded to Target Debtor and its counsel in an amount to be determined by this Court. A request for an award of damages and punitive damages is denied. Additionally, Petitioning Creditors' Emergency Motion for Joint Administration of Cases and Emergency Motion to Appoint a Chapter 11 Trustee are denied as moot.

## I.     FINDINGS OF FACT

This Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, which incorporates Fed. R. Bankr. P. 7052 and 9014. To the extent that any finding of fact constitutes a conclusion of law, it is adopted as such. To the extent that any conclusion of law constitutes a finding of fact, it is adopted as such. This Court made certain oral findings and conclusions on the record. This memorandum opinion supplements those findings and conclusions. If there is an inconsistency, this memorandum opinion controls.

### A. Background History

Target Debtor is a home construction company controlled, at least in part, by Robert Parker ("*Parker*").[1] Each of the Petitioning Creditors are special purpose entities owned by Charles Foster ("*Foster*") set up to build one or more custom homes with Target Debtor (each a

---

[1] 8/15/2019 Hr. 31: 12–15 (While Parker self-identified himself at trial as a "consultant" to HL Builders and his wife, Anna Williams, as the owner of HL Builders, it is clear to this Court that he has intimate and detailed knowledge of HL Builders. Parker represented to this Court at trial that he was the only person that interacted directly with Foster on behalf of Petitioning Creditors and himself on behalf of Target Debtor.).

"*Project*").[2]   Parker and Foster began their business relationship in 2006.[3]   During 2013 and 2014, Petitioning Creditors entered into a set of contracts with Target Debtor.[4]   These contracts were in connection with four Projects:

    i.   415 Shadywood, Houston, Texas 77057 ("*415 Shadywood*") owned by 415 Shadywood, LLC;

    ii.   2203 Looscan Lane, Houston, Texas 77019 ("*2203 Looscan Lane*") owned by 2203 Looscan Lane, LLC;

    iii.   5325 Lynbrook, Houston, Texas 77056 ("*5325 Lynbrook*") owned by Houtex, LLC; and

    iv.   3 Thornblade Circle, Spring, Texas 77389 ("*3 Thornblade*") owned by Houtex, LLC.

Each of the contracts between Petitioning Creditors and Target Debtor include an investor agreement ("*Investor Agreement*").[5]   The Investor Agreements set forth how the Projects are to be financed and provide that there will be a construction loan and an equity loan in connection with each Project.[6]   The equity loan is to be provided by the Petitioning Creditor to fund the initial acquisition and equity for the Project.[7]   The construction loan is also to be provided by the Petitioning Creditor to cover the development and construction of the Project, and is personally guaranteed by Foster.   Specifically, the Investor Agreements provide that the principal amounts of the equity loans of each Project are as follows:

    i.   October 24, 2014 in the amount of $405,000 for 415 Shadywood;[8]

    ii.   August 29, 2014 in the amount of $638,625 for 2203 Looscan;[9]

    iii.   May 16, 2016 in the amount of $339,000 for 5325 Lynbrook;[10] and

    iv.   July 2, 2014 in the amount of $459,750 for 3 Thornblade.[11]

---

[2] *See* Petitioning Creditors' Exs. 1–4.
[3] 8/15/2019 Hr. 31: 21–23.
[4] Petitioning Creditors' Exs. 1–4.
[5] *Id.*
[6] *Id.*
[7] *See id.*
[8] Petitioning Creditors' Ex. 2.
[9] Petitioning Creditors' Ex. 1.
[10] Petitioning Creditors' Ex. 4.
[11] Petitioning Creditors' Ex. 3.

Section 6 of the Investor Agreements provides that any payments in excess of the construction and equity loan for each Project are to be made by the Target Debtor.[12]

Furthermore, after a Project is constructed and completed, the Project is sold, the Investor Agreements establish how the net proceeds of the sale of each Project are to be distributed at closing.[13]   Section 8 of the Investor Agreements provide that the net proceeds are to be distributed in the following order:

i.      Net Proceeds will be used to repay the outstanding balance of the Loan.
ii.     Net Proceeds will be used to repay Investor's equity of [a specified amount for each Project].
iii.    Net Proceeds will be used to pay Investor $50,000.
iv.     Net Proceeds will be used to pay 15% per annum interest on the Equity Loan.
v.      Net Proceeds will be used to pay [Target Debtor] any amount it was required to provide under paragraph 6 of the Agreement.
vi.     Net Proceeds will be used to pay [Target Debtor] $50,000. All remaining Net Proceeds will be split equally between Investor and CD.
vii.    If Net Proceeds are less than the amount required to make the first through the sixth payments listed above, then [Target Debtor] is to provide at closing the funds necessary to make up for the shortfall.

Accordingly, under section 8 of the Investor Agreements, the required payments by Target Debtor include the amounts required under section 6 of the Investor Agreements (*i.e.*, any funds over the construction Loan and the equity Loan) plus a $50,000 payment to the Petitioning Creditors upon the sale of a Project.[14]

As of the filing date of the Amended Involuntary Petition, 415 Shadywood, 2203 Looscan, and 3 Thornblade were sold.[15]   5325 Lynbrook is the only remaining asset held by

---

[12] Petitioning Creditors' Exs. 1–4.
[13] *Id.*
[14] *Id.*
[15] 8/20/2019 Hr. 44: 5–12.

Houtex.[16]  It is stipulated by both parties that at the closing of each Project, Target Debtor did not make a $50,000 payment.[17]

### B.  Filings

On May 20, 2019, Petitioning Creditors filed an involuntary petition ("*Initial Petition*").[18] The Petitioning Creditors' representative in each instance was Foster.  Petitioning Creditors are themselves voluntary Chapter 11 debtors in *In re Houtex Builders, et al.* ("*Foster Entities' Bankruptcy*").[19]  The Initial Petition was subsequently amended on July 11, 2019 and is currently the live pleading before the Court.[20]

### C.  Credibility of Witnesses

In determining whether Petitioning Creditors have established standing under § 303 to file the Amended Involuntary Petition, this Court must, inter alia, assess the credibility of the witnesses.  The Fifth Circuit has focused on "an assessment of witnesses' credibilit[y] and other factual considerations" when reviewing the standing of petitioning creditors.[21]  At trial, Petitioning Creditors and Target Debtor each called one witness, Foster and Parker, respectively.[22]  In many respects, the testimony of the two directly conflicted.  For example, Parker's position is that the Investor Agreements became unworkable, and through discussions between him and Foster, the Investor Agreements were materially modified.[23]  Foster, when

---

[16] 7/16/2019 Hr. 37: 11–17.

[17] Min. Entry (07/16/2019); Min. Entry (08/20/2019).

[18] ECF No. 1.

[19] Petitioning Creditors are Chapter 11 debtors in the jointly administered Case Number 18-34658, *In re HouTex Builders, et al.*, pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

[20] ECF Nos. 1, 23.

[21] *In re OGA Charters, LLC*, 554 B.R. 415, 423 (Bankr. S.D. Tex. 2016); *see Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 221 (5th Cir.1993).

[22] Min. Entry (07/16/2019); Min. Entry (08/15/2019); Min. Entry (08/20/2019).

[23] ECF No. 48; 8/20/2019 Hr. 7: 13–14 ("I can tell you there were numerous discussions that occurred that would have resulted in a change."); 8/20/2019 Hr. 26: 5–7 ("[I]t was replaced by the modifications that occurred over the period of time after assigning of this project.").

asked, "did you ever agree to amend or modify the investor agreements associated with any of the petitioning creditors?" responded, "No.  I don't remember any of those discussions of anything like that.  No, not at all."[24]  Accordingly, much of this Court's decision relies on the credibility of Foster and Parker.

First, Parker was previously found to be "dishonest and disingenuous" as a witness.[25]  In that case, the court found that Parker was an unreliable witness where his counsel stated objections in a Rule 2004 examination and instructed Parker not to respond where it was baseless and without merit.[26]  In contrast, Parker answered all questions at trial without the assistance of counsel.  This Court finds that Parker does not lack all credibility.  Despite at times lacking in exactitude, Parker's testimony was forthcoming and knowledgeable with respect to his involvement with HL Builders.  He recounted with some level of detail the reasons for which modifications to the Investor Agreements occurred, including the fact that Foster had lost money in previous projects the two were doing, and was unable to fund the equity as provided for under the original terms of the Investor Agreements.[27]  He testified to the increased involvement of Foster in the Projects, and recounted meetings between him, Foster, and the other investors such as Hmaiden.[28]  Parker's answers cannot be categorized as evasive or without merit.  Consequently, although there is reason to be cautious, the Court finds the testimony of Parker to be credible.

Second, this Court must address the credibility of Petitioning Creditors' witness, Foster.  While generally responsive, his lack of knowledge or naivete in Petitioning Creditors' business

---

[24] 8/20/2019 Hr. 81: 7–11.
[25] Petitioning Creditors' Ex. 35; *see* Case No. 18-34658.
[26] *Id.*
[27] 8/15/2019 Hr. 37: 12–25; 8/15/2019 Hr. 38: 11–14; 8/15/2019 Hr. 39: 5–14.
[28] *Id.*

dealings is concerning to the Court.  Foster testified, notwithstanding his background as an attorney and business relationship with Target Debtor, that he was unaware of the contents of documents that he himself signed and denied having met bankers that provided third party loans to the Projects.[29]  While the Court does not find Foster to be entirely lacking in credibility, Foster's testimony calls into question Petitioning Creditors' true motives for placing Target Debtor into an involuntary bankruptcy proceeding and as such is taken into account in this Court's analysis.

Therefore, this Court does not discredit the testimony of Foster or Parker.  The contradictory statements made by each are evaluated in the Court's analysis.

## II.    CONCLUSIONS OF LAW

### A.  Jurisdiction, Venue, and this Court's Constitutional Authority to Enter a Final Order

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334 and now exercises its jurisdiction in accordance with Southern District of Texas General Order 2012–6.[30]  This Court determines that pursuant to 28 U.S.C. § 157(b)(1), the instant matter before the Court is a core proceeding arising under Title 11.  The statutory authority for the contested matter before the court is 11 U.S.C. § 303(b).  More specifically, this Court has been tasked with determining, inter alia, whether the claims of the Petitioning Creditors are contingent as to liability or are the subject of a bona fide dispute as to liability or amount under § 303(b)(1), or whether an order for relief should be entered against Target Debtor.  Consideration of the entry of an order for relief on an involuntary petition is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2)(A) & (O) over which this Court has the constitutional authority to enter a final order with respect thereto.

---

[29] 7/16/2019 Hr. 88: 18–20; 8/20/2019 Hr. 77: 10–11.
[30] *In re*: *Order of Reference to Bankruptcy Judges*, Gen. Order 2012–6 (S.D. Tex. May 24, 2012).

Finally, venue is governed by 28 U.S.C. §§ 1408, 1409.  Here, venue is proper because over the last 180 days before the filing of this Amended Involuntary Petition, Target Debtor had its domicile, principal place of business, or principal assets located in this district longer than in any other district.[31]

### 1.  Jurisdictional Arguments

Petitioning Creditors' Initial Petition alleged "that the debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount."[32]  On June 11, 2019, Target Debtor filed an answer to the Initial Petition.[33]  On July 11, 2019, however, Petitioning Creditors filed an Amended Involuntary Petition which is currently the live pleading before the Court.[34]  Curiously, the Amended Involuntary Petition fails to contain the same allegations made in paragraph 11 of the Initial Petition, "that debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount."  Nevertheless, Target Debtor failed to file an answer to the Amended Involuntary Petition.

Target Debtor contends that the Amended Involuntary Petition should be dismissed because of Petitioning Creditors' failure to declare an allegation under paragraph 11.[35]  However, those who live in glass houses should not throw stones.  In response, Petitioning Creditors point out Target Debtor's own procedural deficiency, arguing that an order for relief should be entered for failure of the Target Debtor to file an answer to the Amended Involuntary Petition under § 303(h).  As shown below, the jurisdictional arguments advanced by both parties fail by placing

---

[31] ECF No. 1 (Allegation was made by checking a box in paragraph 11.).
[32] *Id.*
[33] ECF No. 8.
[34] ECF No. 23.
[35] ECF No. 48.

form over substance.

As for the Amended Involuntary Petition, Target Debtor asserts that Petitioning Creditors did not establish a jurisdictional basis for filing an involuntary petition when they failed to check the box under paragraph 11 asserting that "debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount."[36] Petitioning Creditors' failure to check the box, the argument goes, is dispositive in the Petitioning Creditors' standing to bring the involuntary petition because the allegation is a mandatory component of an involuntary petition under § 303.[37]  At the hearing held on August 15, 2019, Petitioning Creditors' counsel stated that the failure to check the box in the Amended Involuntary Petition "was just an oversight."[38]  Case law on the matter suggests, and this Court agrees, that Petitioning Creditors' failure to check the box in the Amended Involuntary Petition after checking the box in the Initial Petition has no impact on this Court's jurisdiction.  Courts within the Fifth Circuit, as well as in other circuits, have held that the statutory requirements for an involuntary petition under § 303 are not jurisdictional.[39]  Rather, § 303's undisputed claims requirement goes to the merits, an element that must be established to sustain an involuntary petition.  Petitioning creditors must still demonstrate that their claims are not contingent as to liability or the subject of a bona fide dispute as to liability or amount, nevertheless this Court is not without jurisdiction prior to that determination.[40]  Accordingly, this Court will not dismiss the Amended Involuntary Petition for lack of jurisdiction because it is immaterial that Petitioning

---

[36] *Id.*

[37] *Id*; *see* 11 U.S.C. § 303(b).

[38] ECF No. 39; Min. Entry (08/15/2019).

[39] *In re Smith*, 415 B.R. 222, 238 (Bankr. N.D. Tex. 2009); *see In re Trusted Net Media Holdings, LLC*, 550 F.3d 1035 (11th Cir. 2008); *In re Rubin*, 769 F.2d 611, 614 n. 3 (9th Cir.1985); *In re AMC Investors, LLC*, 406 B.R. 478, 482 (Bankr. D. Del. 2009) ("The filing of an involuntary petition, even when the alleged debtor challenges whether the petitioning creditor's claim is valid, creates a 'case under title 11' and falls within the subject matter jurisdiction of this Court.").

[40] *See In re Rubin*, 769 F.2d at 611.

Creditors' failed to check the same box in paragraph 11 of the Amended Involuntary Petition.

As for the failure of Target Debtor to answer the Amended Involuntary Petition, Petitioning Creditors request that this Court enter an order for relief against Target Debtor under § 303(h) because "[i]f the petition is not timely controverted, the court shall order relief against the debtor . . ."[41]  Target Debtor did not file an answer to the Amended Involuntary Petition, the live pleading.  Thus, as a technicality, the Amended Involuntary Petition is uncontroverted.  This Court is unwilling to accept Petitioning Creditors' invitation to enter an order for relief based on Target Debtor's failure to answer the Amended Involuntary Petition because doing so would be exalting form over substance.

In *Davenport v. Rodriguez*, the district court held that when a complaint has been amended after the filing of a motion to dismiss, the court should consider the differences between the original and amended complaint, and apply the motion to dismiss to the amended pleading if the defects remain.[42]  The court in *Matter of Young* held that requiring the trustee to file a formal objection after already having filed a motion to compel prior to the debtor's amended schedules "would be putting form over substance."[43]

Similarly, this Court will not enter an order for relief for failure of the Target Debtor to file an answer to the Amended Involuntary Petition under § 303(h) because, for all intents and purposes, Target Debtor has responded to the claims made by Petitioning Creditors in the Amended Involuntary Petition.  First, Target Debtor filed a timely answer to Petitioning Creditors' Initial Petition.[44]  In comparing the Initial Petition and Amended Involuntary Petition, no substantive changes were made that would render Target Debtor's answer insufficient.  The

---

[41] 11 U.S.C. § 303(h).
[42] *Davenport v. Rodriguez*, 147 F. Supp. 2d 630, 635 (S.D. Tex. 2001).
[43] *Matter of Young*, 64 B.R. 611, 613 (E.D. La. 1986).
[44] ECF No. 8.

Petitioning Creditors added a case number, added an Employer Identification Number, and switched the corresponding amount of two petitioner claims.[45]  To the satisfaction of this Court, Target Debtor's answer is still responsive to the Amended Involuntary Petition because no additional claims were made, nor any claims removed.  Form should not be granted over substance where only stylistic and inconsequential changes were made in the Amended Involuntary Petition.  Further, both parties appeared before this Court and made arguments on the merits for three days of hearings after the Amended Involuntary Petition was filed.[46]  This Court will not entertain the idea that Petitioning Creditors' Amended Involuntary Petition is uncontroverted because substantively, Target Debtor has answered and sufficiently responded to the claims made.  Therefore, this Court declines Petitioning Creditors invitation to enter an order for relief against Target Debtor under § 303(h) for failure of Target Debtor to file an answer to the Amended Involuntary Petition.

### B.  Involuntary Petition

### 1.  Commencing the Involuntary Petition

Prior to an involuntary petition under § 303, the target debtor must meet the minimal and malleable eligibility criteria under § 109(a), (b), and (d).[47]  Pursuant to these provisions, the target debtor must be a "person," whether natural[48] (and neither a farmer nor a family farmer, as painstakingly defined in § 101)[49] or a "moneyed, business, or commercial corporation."[50]

Once these prerequisites are met, an involuntary case starts once a petition is filed by:

---

[45] ECF No. 23-1.
[46] ECF Nos. 28, 37, 39.
[47] 11 U.S.C. §§ 101(41), 109(a)–(b), 109(d).
[48] 11 U.S.C. § 101(41) (defining "person" for the Code's general purposes to "include[] individual, partnership, and corporation, but . . . not include governmental unit").
[49] 11 U.S.C. § 101(18), 101(20).
[50] 11 U.S.C. § 303(a).

i.  "three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount . . . if such noncontingent, undisputed claims aggregate at least $16,750 more than the value of any lien on property of the debtor securing such claims held by the holders of such claim;"[51]

ii.  "if there are fewer than 12 such holders, excluding any employee or insider . . . and any transferee of a transfer that is voidable under [the Code], by one or more of such holders that hold in the aggregate at least $16,750 of such claims;"[52]

iii.  "if such person is partnership," either "by fewer than all of the general partners" or "by any general partner . . . the trustee of such a general partner, or a holder of a claim against such a partnership" if relief was ordered "with respect to all of the general partners in such a partnership;"[53] or

iv.  "by a foreign representative of the estate in a foreign proceeding concerning such person."[54]

Distilled, § 303(b) permits three categories of persons to file a petition: (1) unsecured creditors with undisputed, noncontingent claims, (2) general partners of a partnership debtor, and (3) foreign representatives of a debtor in a foreign proceeding.[55]

Once these facts have been established, the Code's standard for an order for relief in an involuntary case, specified in § 303(h), depends upon the target debtor's response. If the petition is not "timely controverted," i.e. contested, the bankruptcy court "shall order relief against the debtor . . . under the chapter under which the petition was filed."[56] Otherwise, though only after a trial, relief will follow in one of two situations.[57] First, "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount."[58] Second, "within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take

---

[51] 11 U.S.C. § 303(b)(1).
[52] 11 U.S.C. § 303(b)(2).
[53] 11 U.S.C. § 303(b)(3).
[54] 11 U.S.C. § 303(b)(4).
[55] 11 U.S.C. § 303(b).
[56] 11 U.S.C. § 303(h).
[57] *Id.*
[58] 11 U.S.C. § 303(h)(1).

charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession."[59]

Read together, in the absence of a custodian's appointment, § 303(b) and (h) impose four obligations on the petitioning creditors, a quartet that must be proven at trial.  In particular, the bankruptcy court must determine whether:

i.    Either three or more creditors (where the total number of creditors exceeds twelve) or at least one (where the total number falls below twelve), once certain exclusions are made, exist;
ii.   The creditor(s) hold claim(s) against the target debtor that are not contingent as to liability or are the subject of a bona fide dispute as to liability or amount;
iii.  The claim(s) total at least $16,750; and
iv.   The target debtor is generally not paying debts, except those that are contingent as to liability or are the subject of a bona fide dispute as to liability or amount, as they come due.

This Court must analyze Petitioning Creditors' Amended Involuntary Petition in light of the requirements set forth above.

### a.  Numerosity of Creditors and Dollar Amount

First, an involuntary petition under § 303 may be commenced only by three or more holders of qualifying claims; however, a single claimholder may file the petition if the alleged debtor has fewer than twelve creditors.[60]  Here, the Amended Involuntary Petition was filed by three petitioning creditors: Houtex, Shadywood, and Looscan Lane.[61]  Since the case was commenced by three creditors, this requirement is satisfied.

Next, the unsecured sum of creditors' claims must aggregate at least $16,750 against the target debtor.[62]  Here, Petitioning Creditors' claims as pled in the Amended Involuntary Petition

---

[59] 11 U.S.C. § 303(h)(2).
[60] 11 U.S.C. § 303.
[61] ECF No. 23.
[62] 11 U.S.C. § 303(b)(1); *see* Adjustment of Dollar Amounts notes set out under this section and 11 U.S.C. § 104.

against Target Debtor amount to $2,300,555.95.[63]  Petitioning Creditors presented evidence that the basis of their claims stem from third party loans used on each Project.[64]  At trial, deeds of trust against the Projects admitted into evidence and listed in the post-trial briefing support, to this Court's satisfaction, that the sum of Petitioning Creditors' unsecured claims against Target Debtor are at least $16,750.[65]  Accordingly, the dollar amount requirement under § 303 is met.

### b.  Whether Petitioning Creditors' Claims are Contingent as to Liability or the Subject of a Bona Fide Dispute as to Liability or Amount

Next, Petitioning Creditors' contend that the claims made in the Amended Involuntary Petition are not contingent as to liability or are the subject of a bona fide dispute as to either liability or amount.  In response, Target Debtor argues that a bona fide dispute exists as to both liability and amount of the claims because circumstances necessitated material modifications to the Investor Agreements, and the parties had fundamentally changed their deal format.[66]

Under the Investor Agreement as written, each Project is to be financed through a construction loan and an equity loan.[67]  The equity loan is to be provided by the Petitioning Creditor to fund the initial acquisition and equity for each Project.[68]  Additionally, the construction loan is to be provided by the Petitioning Creditor to cover the development and construction of each Project, and is personally guaranteed by Foster.  Under section 6 of the

---

[63] ECF No. 23.
[64] Petitioning Creditors' Exs. 5–7.
[65] Petitioning Creditors' Ex. 38 (Jim D. Nored in the amount of $244,000 against 415 Shadywood); Ex. 39 (Jim D. Nored in the amount of $118,650 against 415 Shadywood); Ex. 40 (Hmaidan & Hmaidan, LLC in the amount of $783,000 against 2203 Looscan); Ex. 41 (Pensco Trust Co. in the amount of $347,600 against 415 Shadywood); Ex. 43 (Jim D. Nored in the amount of $339,000 against 5325 Lynbrook); Ex. 44 (Jim D. Nored in the amount of $90,640 against 5325 Lynbrook).
[66] ECF No. 48.
[67] Petitioning Creditors' Exs. 1–4.
[68] *See id.*

Investor Agreement, if any additional funds or costs exceeding the construction and equity loan are required for each Project, those payments are to be made by the Target Debtor.[69]

Here, Petitioning Creditors contend that Target Debtor caused Petitioning Creditors to use funds from third party loans for each Project, and Target Debtor is responsible for these loans under section 6 of the Investor Agreement because they are not construction loans nor equity loans.[70]   Specifically, Houtex entered into a loan with Spirit of Texas Bank ("*SOTB*") in the amount of $1.6 million ("*$1.6 Million SOTB Note*").[71]   The $1.6 Million SOTB Note was used as follows: (i) 3 Thornblade in the amount of $467,635.43, (ii) 6111 Crab Orchard ("*Crab Orchard*") in the amount of $535,596.50, (ii) 2203 Looscan in the amount of $20,000 (iii) 415 Shadywood in the amount of $406,323.41, (iv) 5669 Bordley ("*Bordley*") in the amount of $14,000.00, and (v) a CD in the amount of $160,000.00.[72]   Next, Houtex entered into a $500,000 line of credit from Spirit of Texas Bank ("*SOTB LOC*") which had $483,745.90 principal and interest outstanding as of the date Houtex filed its voluntary petition for bankruptcy relief and such loan is secured by 3 Thornblade.[73]   Subsequently, Houtex entered into a $387,254.71 loan from Great Southwest Financial Corp ("*GSFC*") that is secured by 3 Thornblade.[74]   In the Amended Involuntary Petition, Petitioning Creditors' claims against Target Debtor totaled $2,300,555.95.[75]   This figure consists of the funds used from the $1.6 Million SOTB Note, the remaining principal and interest of the SOTB LOC, and the loan from GSFC.[76]   Additionally,

---

[69] Petitioning Creditors' Exs. 1–4.
[70] ECF No. 46.
[71] Petitioning Creditors' Ex. 6 at 59–62.
[72] Petitioning Creditors' Ex. 7 at 132–133 ($3,555.34 was the amount used in excess of the $1.6 million SOTB Note.); 8/15/2019 Hr. 57: 3–9 ("Under the terms of the agreement with Spirit of Texas, HouTex and Charles Foster and CD of $160,000 was required to be retained.").
[73] Petitioning Creditors' Ex. 6 at 58, 97–115.
[74] Petitioning Creditors' Ex. 5.
[75] ECF No. 23.
[76] Min. Entry (7/16/2019).

deeds of trust admitted at trial demonstrate that loans were made to the Projects from Pensco Trust, Jim Nored, and Hmaidan & Hmaidan.[77]

Section 8 of the Investor Agreement instructs how the net proceeds are to be distributed upon the sale of each Project.[78]  The net proceeds are distributed in a waterfall of sorts, beginning with a repayment of the construction loan, then a repayment of the equity loan, followed by a payment to the Petitioning Creditor of $50,000.[79]  If there are insufficient funds to make the waterfall of payments with the net proceeds, the Target Debtor is obligated to make up the shortfall and come up with the additional funds.[80]

The Investor Agreements provide that the principal amounts of the equity loans of each Project are as follows:

    i.   October 24, 2014 in the amount of $405,000 for 415 Shadywood;[81]
    ii.   August 29, 2014 in the amount of $638,625 for 2203 Looscan;[82]
    iii.   May 16, 2016 in the amount of $339,000 for 5325 Lynbrook;[83] and
    iv.   July 2, 2014 in the amount of $459,750 for 3 Thornblade.[84]

Here, 5325 Lynbrook is the only remaining asset held by Houtex.[85]  415 Shadywood, 2203 Looscan, and 3 Thornblade were each sold, and the Target Debtor did not make any payments to Petitioning Creditors at the closing of these projects.[86]  Target Debtor did not pay the required $50,000 or fund any shortfalls at the closing of each Project.[87]  Therefore, Petitioning Creditors contend that Target Debtor violated section 8 of the Investor Agreement

---

[77] Petitioning Creditors' Exs. 38, 39, 40, 41, 43, 44.
[78] Petitioning Creditors' Exs. 1–4.
[79] *Id.*
[80] *Id.*
[81] Petitioning Creditors' Ex. 2.
[82] Petitioning Creditors' Ex. 1.
[83] Petitioning Creditors' Ex. 4.
[84] Petitioning Creditors' Ex. 3.
[85] 7/16/2019 Hr. 37: 11–17.
[86] Min. Entry (07/16/2019); Min. Entry (08/20/2019); 8/20/2019 Hr. 44: 5–12.
[87] Min. Entry (07/16/2019); Min. Entry (08/20/2019).

when Target Debtor did not make any payments to Petitioning Creditors upon the closing of the three Projects that sold.  According to Petitioning Creditors, Target Debtor is responsible for, at a minimum, the loan amounts that exceed the equity loan amounts in the Investor Agreements as listed in post-trial briefing: $711,573.41 for 415 Shadywood; $119,375.00 for 2203 Looscan; $878,886.04 for 3 Thornblade; and $90,640.00 for 5325 Lynbrook.[88]  However, in order to have standing to file the Amended Involuntary Petition under § 303(b), this Court must conclude that Petitioning Creditors' claims resulting from Target Debtor's alleged violations of the Investor Agreements are not contingent as to liability or are the subject of a bona fide dispute as to the liability or amount of such claims.[89]

### i.     Whether Petitioning Creditors' Claims are Contingent as to Liability

A claim, as defined under the Bankruptcy Code, is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[90]  The Fifth Circuit has stated that a contingent claim is one where liability of "the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created."[91]  The *In re All Media Properties, Inc.* court stated that "just because a claim is unliquidated, disputed or unmatured apparently does not mean it is contingent" and that "[o]nly holders of claims that are contingent as to liability are denied the right to be petitioning creditors."[92]  Thus, Petitioning Creditors must demonstrate that each of

---

[88] ECF Nos. 46, 49.
[89] 11 U.S.C. § 303(b).
[90] 11 U.S.C. § 101(5)(A).
[91] *In re Sims,* 994 F.2d at 220; *see also In re All Media Properties, Inc.,* 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980).
[92] *In re All Media Properties, Inc.,* 5 B.R. at 133 (Bankr. S.D. Tex.1980).

their claims are not contingent, without respect to the liquidated nature under the first prong of § 303(b)(1).[93]

For example, neither past due rental payments under a lease[94] nor future rental payments[95] are contingent as to liability. Promissory notes in default or invoices from trade creditors that are overdue are not claims that are contingent as to liability.[96] An example of a claim that is contingent as to liability is that of a guarantor of payment; until it is clear that the principal obligor is unable to pay, the obligation of the guarantor remains contingent.[97] Another example concerns a debtor who owes a sales agent commissions only if potential purchasers actually buy the goods in question.[98] If no sales have been made as of the date the involuntary petition is filed, the debtor's obligation to the sales agent is contingent as to liability since commission payment hinges on the happening of a future event, namely a sale.[99]

Here, Petitioning Creditors have claims against Target Debtor with respect to four Projects: 415 Shadywood, 2203 Looscan, 3 Thornblade, and 5325 Lynbrook.[100] When the Amended Involuntary Petition was filed, three of the four Projects were sold, and 5325 Lynbrook remained the only asset owned by Houtex.[101] With respect to the claims against the three Projects sold, there is no contingency as to liability because under the Investor Agreements, the Target Debtor's legal duty to pay was triggered upon the sale of the Projects.[102] Similar to the way in which a debtor's obligation to pay commission to a sales agent is contingent upon a sale,

---

[93] *In re OGA Charters, LLC*, 554 B.R. at 423.
[94] *In re Sims*, 994 F.2d at 220.
[95] *In re Miller*, 2013 Bankr. LEXIS 85, at *28–32 (Bankr. E.D. Tenn. Jan. 9, 2013).
[96] *In re Mavellia*, 149 B.R. 301, 304 (Bankr. E.D.N.Y. 1991); *In re All Media Properties, Inc.*, 5 B.R. 126 at 132–33.
[97] 2 Collier on Bankruptcy P 303.10 (16th 2019).
[98] 2 Collier on Bankruptcy P 303.10 (16th 2019).
[99] *In re Skye Mktg. Corp.*, 11 B.R. 891 (Bankr. E.D.N.Y. 1981).
[100] ECF No. 23.
[101] 7/16/2019 Hr. 37: 11–17; 8/20/2019 Hr. 44: 5–12.
[102] Petitioning Creditors' Exs. 1–4.

the future event contemplated by Target Debtor and Petitioning Creditors at the time the original relationship of the parties was created was the sale of the Projects.[103]

Under section 8 of the Investor Agreement, Target Debtor is to make the waterfall of payments to Petitioning Creditors using the net proceeds of the sale, beginning with a repayment of the construction loan, then a repayment of the equity loan, followed by a payment to the Petitioning Creditor of $50,000, plus any additional payments required under section 6.[104] Petitioning Creditors' claims involving 415 Shadywood, 2203 Looscan, and 3 Thornblade are not contingent as to liability because the sale of these projects already occurred when the Amended Involuntary Petition was filed.[105]  There is no longer any outside or future event that would change the contingency status between Target Debtor and Petitioning Creditors regarding the three Projects.  However, that is not to say that the duty to pay is not in dispute, or that Target Debtor is liable for Petitioning Creditors' claims.  Target Debtor's argument that subsequent modifications of the Investor Agreement occurred only renders the debt a disputed one, it does not make it a contingent one.[106]  Accordingly, Petitioning Creditors' claims against Target Debtor with respect to 415 Shadywood, 2203 Looscan, and 3 Thornblade satisfy § 303's requirement because they are not contingent as to liability.

Houtex's 5325 Lynbrook project, on the other hand, was not sold when the Amended Involuntary Petition was filed.[107]  Because the Project remained unsold, the Target Debtor's legal duty to pay under the Investor Agreement has not been triggered.  The sale, an outside or future

---

[103] *See In re* Skye Mktg., 11 B.R. at 891.
[104] Petitioning Creditors' Exs. 1–4.
[105] *See* ECF No. 23; 7/16/2019 Hr. 37: 11–17; 8/20/2019 Hr. 44: 5–12.
[106] *See In re All Media Properties, Inc.,* 5 B.R. at 133 ("On the other hand, in the ordinary debt arising from, for example, a sale of merchandise, the parties to the transaction would not at that time view the obligation as contingent. Subsequent events might lead to a dispute as to liability because of, for example, defective merchandise, but that would merely serve to render the debt a disputed one but would not make it a contingent one.").
[107] 7/16/2019 Hr. 37: 11–17; 8/20/2019 Hr. 44: 5–12.

occurrence, is necessary to bring Target Debtor's duty to pay the Petitioning Creditor into existence.  Target Debtor is not obligated to make the payments under section 8 of the Investor Agreement absent a sale.  Therefore, Petitioning Creditors' claims regarding 5325 Lynbrook are contingent as to liability, and cannot be used to support an involuntary petition against Target Debtor.

### ii.    Whether There Exists a Bona Fide Dispute as to Liability or Amount of the Petitioning Creditors' Claims

Now that the Court has determined that some of Petitioning Creditors' claims are not contingent as to liability, the next step is to determine whether Petitioning Creditors' claims are the subject of a bona fide dispute as to liability or amount.  If there is a bona fide dispute as to whether Target Debtor is liable for the loans taken out in connection with the Projects or the amount of such claims due under the Investor Agreements, this Court cannot hear or resolve the dispute.[108]   In considering this prohibition, "[t]he court's objective is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute."[109]  This Court may, however, conduct a limited analysis of the legal issues in order to ascertain whether there is an objective basis for either a factual or legal dispute as to the validity of the debt.[110]  Petitioning Creditors' claims must be evaluated, in large part, by an assessment of the witnesses' credibility as well as other factual considerations.[111]

Although "bona fide dispute" is not defined under the Bankruptcy Code, the Fifth Circuit has adopted an "objective standard" when determining whether a bona fide dispute exists.[112]

---

[108] 11 U.S.C. § 303(b).
[109] *In re Sims,* 994 F.2d at 221.
[110] *In re Green Hills Dev. Co., L.L.C.,* 741 F.3d 651, 658 (5th Cir. 2014); *In re eBackpack*, LLC, 605 B.R. 126, 133 (Bankr. N.D. Tex. 2019).
[111] *See In re Sims,* 994 F.2d at 221.
[112] *Id.*

The Fifth Circuit holds that under the "objective standard" test, "neither the debtor's subjective intent nor his subjective belief is sufficient to meet [his] burden" of proving a bona fide dispute exists.[113]  Simply put, Target Debtor's subjective belief that the amount owed to Petitioning Creditors is uncertain or unknown is insufficient in proving that a bona fide dispute exists.[114]  This Court must therefore *objectively* determine that there are not substantial questions of fact and law regarding Petitioning Creditors' claims in order to meet the requirements of § 303(b)(1).[115]

The burden first falls on Petitioning Creditors to make a prima facie case that there is not a bona fide dispute as to either liability or amount of their claims.[116]  Petitioning Creditors must satisfy the requirements of § 303 by a preponderance of the evidence.[117]  This is not a very high burden.  If satisfied, the burden then shifts to Target Debtor "to present evidence demonstrating that a bona fide dispute does exist."[118]

Here, Petitioning Creditors' aforementioned argument establishes a prima facie case that there is not a bona fide dispute as to their claims.  Petitioning Creditors produced evidence of the Investor Agreements for each Project, deeds of trust showing third party loans taken out against the Projects, elicited testimony at trial that three of the four Projects were sold, and that Target Debtor did not make any payments at the closing of those Projects.[119]  The Court finds that the evidence provided by Petitioning Creditors is enough to shift the burden to the Target Debtor to present evidence that a bona fide dispute exists.

---

[113] *Id.*
[114] *See In re CorrLine Int'l, LLC*, 516 B.R. 106, 146 (Bankr. S.D. Tex. 2014).
[115] *Id.* at 146.
[116] *Id.* ("[T]he petitioning creditor must establish a prima facie case that no bona fide dispute exists.").
[117] *In re Moss,* 249 B.R. 411, 418 (Bankr. N.D. Tex. 2000).
[118] *In re Sims,* 994 F.2d at 221.
[119] Petitioning Creditors' Exs. 1–4, 38, 39, 40, 41, 43, 44; 7/16/2019 Hr. 37: 11–17; 8/20/2019 Hr. 44: 5–12.

In the Amended Involuntary Petition, Petitioning Creditors allege that the $1.6 million SOTB Note, the remaining principal and interest of the SOTB LOC, and the loan from GSFC are owed by Target Debtor because these were funds obtained in contravention of the Investor Agreement.[120]  At trial, Petitioning Creditors argued that the deeds of trust obtained from Pensco Trust, Jim Nored, and Hmaidan & Hmaidan in connection with the Projects are not equity or construction loans, and Target Debtor is responsible for repaying these loans under section 6 of the Investor Agreement.[121]  Lastly, by failing to make any payments to Petitioning Creditors at the closing of the Projects sold, it is asserted that Target Debtor violated the waterfall provision in section 8 of the Investor Agreement.[122]  In post-trial briefing to this Court, Petitioning Creditors argue that even if the third party loans listed above are equity loans, Target Debtor still owes the funding in connection with each Project that exceeds the equity loan amounts set forth in the Investor Agreements.[123]

In response, Target Debtor contends, and this Court agrees, that the claims alleged by Petitioning Creditors in the Amended Involuntary Petition and at trial are the subject of a bona fide dispute as to both liability and amount.  The history of the business relationship between Parker and Foster supports the proposition that modifications to the Investor Agreements were in fact established, creating a bona fide dispute as to whether Target Debtor is liable for the loans taken out in connection with the Projects or the amount of such claims due under the Investor Agreements.

---

[120] ECF No. 23.
[121] Min. Entry (07/16/2019); Petitioning Creditors' Exs. 38, 39, 40, 41, 43, 44.
[122] Petitioning Creditors' Exs. 1–4.
[123] The equity loans in the Investor Agreements are as follows: $405,000.00 for 415 Shadywood; $638,625.00 for 2203 Looscan; $339,000 for 5325 Lynbrook; and $459,750 for 3 Thornblade.  As listed in the Petitioning Creditors' Post-Trial Brief, ECF No. 46., the amounts claimed to be in excess of the permitted equity loans in the Investor Agreements are the following: $711,573.41 for 415 Shadywood; $119,375.00 for 2203 Looscan; $878,886.04 for 3 Thornblade; and $90,640.00 for 5325 Lynbrook.

First, contrary to what Petitioning Creditors have attempted to lead this Court to believe, the fact that Foster did not fund the equity for the Projects is relevant in showing that a modification to the Investor Agreements occurred.[124]   Since the inception of the business relationship between Foster and Target Debtor, the language of the Investor Agreements for each project remained the same.[125]   When Foster and Target Debtor began developing homes together in 2006, Foster would guarantee the credit and put in the equity for each project.[126]   For example, Foster guaranteed the debt and put in around $200,000 of equity in the first project with Target Debtor for a house on Cortland Street.[127]   This arrangement continued for several projects.[128]   However, despite having the same Investor Agreements for the Projects in this case, Foster did not fund the equity.[129]   At trial, Target Debtor proffered sufficient evidence demonstrating that Foster did not fund the equity in 415 Shadywood, 2203 Looscan Lane, 5325 Lynbrook, or 3 Thornblade after losing his money in two prior projects, Green Tree and Longmont.[130] According to Parker, Foster funded those two projects with 100 percent equity, and subsequently ran out of money.[131]   Because Foster had run out of money, he was unable to fund any further projects and instructed Parker to find alternative sources of funding.[132]   Parker testified that at Foster's behest, the equity in all subsequent projects was funded from third party sources.[133]   As

---

[124] ECF No. 49.
[125] 8/15/2019 Hr. 42: 1–13; 8/20/2019 Hr. 38: 10–18.
[126] 7/16/2019 Hr. 22: 11–12, 19–20; 7/16/2019 Hr. 23: 18–19.
[127] 7/16/2019 Hr. 23: 1–2; 8/15/2019 Hr. 32: 1–2.
[128] 7/16/2019 Hr. 26: 16–24 (North Boulevard near Kirby); 8/15/2019 Hr. 33: 2–6 (Southgate Boulevard); 7/16/2019 Hr. 26: 24–25; 7/16/2019 Hr. 27: 1–9 (West Alabama).
[129] 8/15/2019 Hr. 43: 7–14.
[130] 8/15/2019 Hr. 38: 24–25.
[131] *Id.*
[132] 8/15/2019 Hr. 39: 1–4.
[133] 8/15/2019 Hr. 42: 17–25; 8/15/2019 Hr. 43: 5–14.

evidenced by the third party loans and deeds of trust, Petitioning Creditors did not fund the equity for the Projects in the manner contemplated by the Investor Agreements.[134]

If the parties modified their agreement to permit equity funding to come from third party lenders as opposed to coming from Petitioning Creditors, it would impact the liability and amounts owed by Target Debtor to Petitioning Creditors under the Investor Agreements. Foster's failure to provide equity to the Projects is highly probative of a modification to the Investor Agreements because over the course of the business relationship between Foster and Target Debtor the parties used the same written agreement, yet the actions of the parties changed over time. Petitioning Creditors cannot claim that it is undisputed that the Investor Agreements were not modified, while at the same time claim that the Petitioning Creditors did not have to fund the equity of the Projects as contemplated by the Investor Agreements. Petitioning Creditors cannot have it both ways.

In the post-trial briefing to this Court, Petitioning Creditors argue that since the Investor Agreements provide that the "Investor" make the equity loan, it is not inconsistent with the terms of the Investor Agreement for an investor other than Foster to make the equity loan.[135] This rationale ignores the course of conduct between the parties. The Investor Agreement, quite clearly, is an agreement between the Petitioning Creditors and Target Debtor. The fact that Foster did not fund the equity for the Projects and the way in which the funding of the projects changed over time demonstrates more than a subjective belief that the amount owed to Petitioning Creditors is uncertain or unknown. Accordingly, this Court finds that a valid credible

---

[134] Petitioning Creditors' Exs. 38, 39, 40, 41, 43, 44; Petitioning Creditors' Exs. 1–4 ("Any loans for purchase and development of the Property shall be solely in the name of Investor . . . Investor agrees that Investor will not encumber the Property other than for the initial acquisition and construction loan from Independent, N.A.").
[135] ECF No. 49.

dispute exists as to whether a modification of the Investor Agreement occurred, placing the liability and amount owed by Target Debtor squarely at issue.[136]

Second, the delay of construction and sale of two projects between Foster and HL Builders before any construction began is indicative of a modification to the Investor Agreements. Target Debtor asserts that after Foster leveraged up with multiple and larger dollar projects in conjunction with the collapse of oil prices by late 2014 and into 2015, the parties had made modifications to the Investor Agreements.[137] Foster testified that in 2014, Foster and Parker were involved in the purchase of at least four projects.[138] At the same time these projects were purchased, Foster was already funding the equity in Green Tree and Longmont.[139] In addition to this, the price for oil declined, and Parker testified that Foster was concerned about its impact on the market for homes.[140] Consequently, Foster expressed "grave concern" to Parker because he may have "gotten in too far" and directed that the completion of the existing projects be delayed.[141] A delay in construction would have been a modification to the agreement between parties. Pursuant to the contractor agreements for each Project, separate from the Investor Agreements, the Debtor was to substantially complete construction of each Project within one

---

[136] Petitioning Creditors' post-trial briefing references Foster's trial testimony that Foster believed his equity in Green Tree and Longmont was used as equity for other projects, including the Projects in this case. This very disagreement as to the reason for a need to acquire third party funding in connection with the Projects highlights that there is a valid dispute as to liability and amount due under the Investor Agreements. Whether Foster lost his money in Green Tree and Longmont or rolled forward his equity into future projects, a valid credible dispute exists.
[137] ECF No. 48.
[138] 8/20/2019 Hr. 56: 1–3 (". . . Crab Orchard, 3 Thornblade, Looscan Lane, Shadywood and Bordley. All of those properties were purchased in 2014.").
[139] Id. at 4–6.
[140] 8/15/2019 Hr. 44: 4–6.
[141] 8/15/2019 Hr. 37:10–21; 8/20/2019 Hr. 41: 3–5 (Parker testified: "Bob, I am very concerned about these projects. The market may turn bad. Let's delay, delay, delay, delay.").

year.[142]   Therefore, Foster's instruction to delay construction runs contrary to the written agreement, representing a modification to the contracted performance of the parties.

According to Parker, the delay in construction caused enormous costs of carry between loans with interest and property taxes.[143]   Consequently, two projects owned by Houtex, Crab Orchard and Bordley, were sold at Foster's behest as undeveloped properties for a loss of approximately two million dollars.[144]   Each party's witness testified at trial that Crab Orchard and Bordley were sold prior to the commencement of any construction even though the original plan was for construction of those properties.[145]   Therefore, in light of the history of business dealings between Foster and Target Debtor, the Court finds that the precarious financial situation of Foster combined with the sale of two prior projects before the start of construction demonstrates that the parties had not always abided by the exact terms of the Investors Agreements.

Foster rejects the testimony and allegations made by Parker in almost every respect. Foster testified that there were no modifications to the terms of the deal between Petitioning Creditors and Target Debtor.[146]   He testified that section 6 of the Investor Agreement was never changed, and that if any other funds were required in the Projects, other than the construction or equity loans, those funds were to be provided by Target Debtor.[147]   Parker, on the other hand, stated on the record that Foster was well aware of negotiations with the third party lenders for the

---

[142] Petitioning Creditors' Exs. 1–4; 8/15/2019 Hr. 22–25.
[143] 8/15/2019 Hr. 46: 1–25.
[144] *Id.*
[145] 7/16/2019 Hr. 94: 4–6, 14–16 (Question: "Mr. Foster, there was supposed to be construction on those, weren't there? That was part of your original deal." Answer: "Yes."); 7/16/2019 Hr. 102: 8–20; 8/15/2019 Hr. 44: 4–9 ("Well, he was greatly concerned about the impact of the decline in the price of oil.  And he communicated to me, Bob, I – let's slow down.  We've got to stop.  As you know, later on, he insisted on the sale of two of the properties, Bordley and Crab Orchard, without ever allowing us to even start construction.").
[146] 7/16/2019 Hr. 112: 16–23.
[147] *Id.*

Projects such as Jim Nored, and attended meetings with a representative from Spirit of Texas Bank prior to signing for the $1.6 million SOTB Note.[148]  However, Foster adamantly disagreed by stating "I've never met or heard of or I never – of a Jim Nored, that person at all."[149]  Next, in response to whether Foster asked Parker to slow down construction on any Projects, Foster testified "No. I want to be very clear. It was just the opposite."[150]

Foster's testimony at trial directly conflicting with that of Parker's is not enough to remove the shadow cast in the form of a bona fide dispute upon Petitioning Creditors' claims. Foster has been an attorney for over 40 years, even advertised as a "super lawyer".[151]  Despite Foster's background as an attorney and experience in real estate, he testified that he was unaware of the nature of many legal documents that he signed.  When asked whether he guaranteed the $1.6 million dollar loan at Spirit of Texas Bank, Foster testified, "Apparently so."[152]  He alleges that he was unaware that he guaranteed the $1.6 million Spirit of Texas loan.[153]  Foster also described his interactions with Parker as "he would ask me to sign documents, those little yellow things, and I would sign them.  I was never aware ever of any conversation about an equity loan document."[154]  He was "surprised" to find out how the $1.6 million SOTB Note was used.[155]  It is difficult to imagine that documentation dealing with figures of such a high value would be taken so lightly by someone with his knowledge and experience.  The evidence produced and testimony elicited at trial concerning Foster's alleged involvement in the decisions to acquire third party funding as well as delay of the construction of Projects is at a minimum, in dispute.

---

[148] 8/15/2019 Hr. 54: 8/15/2019 Hr. 55: 1–5.
[149] 8/20/2019 Hr. 77: 10–11.
[150] 8/20/2019 Hr. 80.
[151] 7/16/2019 Hr. 115: 14–25.
[152] 7/16/2019 Hr. 88: 18–20.
[153] 7/16/2019 Hr. 97: 23–25 ("I thought that was a renewal or modification of an existing construction loan.  I never would have guaranteed a loan that Bob was making to a personal friend of his.").
[154] 8/20/2019 Hr. 87: 13–16.
[155] 8/20/2019 Hr. 84: 13–19.

It is important to emphasize here that the bankruptcy court's job under § 303(b) is not to conduct a through trial and determine the proper legal result.[156]  The bankruptcy court should only determine, objectively, whether there is a bona fide dispute.[157]  After a three day trial, nearly every aspect of the Petitioning Creditors' claims has been vehemently contested and controverted through live witness testimony and documentary evidence.  This Court could not possibly determine whether Target Debtor is liable for the amounts claimed in the Amended Involuntary Petition by Petitioning Creditors or whether the Investor Agreements were modified to eliminate Target Debtor's liability in making the payments under sections 6 and 8 to Petitioning Creditors without conducting a full trial on the merits.  The Court's decision regarding the instant dispute certainly does not determine the actual liability of or amounts due by the parties, only that the claims are the subject of a bona fide dispute as to liability or amount.  Accordingly, this Court finds that Petitioning Creditors lack standing to bring the Amended Involuntary Petition because their claims are the subject of a bona fide dispute as to liability and amount.

### c.  Whether Target Debtor is Generally Not Paying its Debts as They Become Due

In order for the Court to enter an order granting the Amended Involuntary Petition, Petitioning Creditors must demonstrate that Target Debtor is generally not paying its debts as they become due, unless those debts are the subject of a bona fide dispute as to liability or amount.[158]  The determination of whether the debtor is generally paying its debts as they become due is made as of the filing date of the involuntary petition.[159]  While the Bankruptcy Code does

---

[156] *See In re Green Hills Dev. Co., L.L.C.*, 741 F.3d at 658–59 ("[T]he court's aim is to ascertain whether a dispute that is bona fide exists . . . not to actually resolve the dispute.").
[157] *See id.* at 658.
[158] 11 U.S.C. § 303(h).
[159] *In re Sims*, 994 F.2d at 222.

not define the term "generally not paying" its debts, courts consider the following factors: the number of debts; the amount of the delinquency; the materiality of the nonpayment; and the nature and conduct of the debtor's business.[160]  No one factor is more meritorious than another; what is most relevant depends on the facts of each case.[161]  Courts have held that "generally not paying debts" includes regularly missing a significant number of payments, regularly missing payments which are significant in amount in relation to the size of the debtor's operation, or any debt which the target debtor is not current on as of the petition date.[162]

Here, Petitioning Creditors assert that Target Debtor is generally not paying its debts as they become due in connection with the Projects.[163]  The argument is similar to that as made above: because Target Debtor failed to make payments to Petitioning Creditors at the closing of the Projects, Target Debtor owes Petitioning Creditors the amounts due under sections 6 and 8 of the Investor Agreements.[164]  Petitioning Creditors argue that the amount of debt is substantial, the debt is significant because the funds relate directly to the Target Debtor's principal business activity, and the Target Debtor is mismanaging its business.[165]  However, the Court need not evaluate Petitioning Creditors' arguments advanced under § 303(h) any further because as this Court has already held, the debts that Target Debtor is allegedly not paying as they become due are the subject of a bona fide dispute as to liability and amount.  As noted, this Court could not possibly determine whether Target Debtor is responsible for the amounts claimed by Petitioning

---

[160] *In re Bates*, 545 B.R. 183 (Bankr. W.D. Tex. 2016); *Murrin v. Hanson* (*In re Murrin*), 477 B.R. 99, 107 (D. Minn. 2012); *In re Tarletz*, 27 B.R. 787 (Bankr. D. Colo. 1983).

[161] *In re Bates*, 545 B.R. at 186.

[162] *In re Acis Capital Mgmt., L.P.*, 584 B.R. 115, 143 (Bankr. N.D. Tex. 2018).

[163] ECF No. 46.

[164] *Id.* ("Accordingly, the Debtor owes the Petitioning Creditors, at a minimum, the following amounts - $761,573.41 for 415 Shadywood, $169,375.00 for 2203 Looscan Lane and $1,019,506.04 for Houtex Builders, LLC. These amounts become due at the closing of the Projects which occurred in late 2018, in the case of 3 Thornblade, and early 2019, in the case of 415 Shadywood and 2203 Looscan Lane.").

[165] *Id.*

Creditors or whether the Investor Agreements were modified to eliminate Target Debtor's liability in making the payments under sections 6 and 8 of the Investor Agreements to Petitioning Creditors without conducting a full trial on the merits. Accordingly, an order for relief against Target Debtor under § 303(i) will not be entered because Target Debtor's debts are the subject of a bona fide dispute as to liability and amount.

### 2. Award of Attorney's Fees, Costs, Damages, or Punitive Damages Under § 303(i).

### i. Whether Reasonable Attorney's Fees and Costs Should Be Awarded

If warranted under § 303(i), this Court has discretion to order that Petitioning Creditors pay costs, reasonable and necessary attorney's fees, damages, and punitive damages caused by the filing upon the dismissal of the involuntary case.[166] Such remedies are only available when the dismissal of the involuntary case was without the consent of petitioning creditors and target debtor, and the target debtor has not waived the right to judgment under § 303(i).[167] While the Court may award reasonable and necessary attorney's fees and costs upon the dismissal of the involuntary petition alone, the Court must also find that the petitioning creditors filed the involuntary petition in bad faith before any damages, including punitive damages, may be awarded.[168] However, a finding of bad faith by petitioning creditors is not required for an award of attorney's fees and costs against them following dismissal of an involuntary bankruptcy petition.[169] Accordingly, this Court retains jurisdiction under § 303(i) to award reasonable and necessary attorney's fees and costs in an amount to be determined by this Court.

Here, the parties have neither consented to the dismissal of the Amended Involuntary Petition nor has Target Debtor waived its right to judgment under § 303(i). In post-trial briefing,

---

[166] 11. U.S.C. § 303(i).
[167] *Id.*
[168] 11. U.S.C. § 303(i)(1), (i)(2).
[169] 11. U.S.C. § 303(i); *In re Clean Fuel Techs. II, LLC*, 544 B.R. 591 (Bankr. W.D. Tex. 2016).

Target Debtor requested an award of fees and sanctions.[170]  Therefore, upon the dismissal of the instant Amended Involuntary Petition, the Court invites Target Debtor's counsel to file an application for and reasonable and necessary attorney's fees and costs pursuant to § 303(i)(1) because there is neither consent of the parties nor any waiver by Target Debtor.

### ii. Whether the Amended Involuntary Petition was Filed in Bad Faith Permitting the Awarding of Damages and Punitive Damages

Next, the Court must determine if Petitioning Creditors filed the Amended Involuntary Petition in bad faith to ascertain whether damages, including punitive damages, should be awarded to Target Debtor.  The Bankruptcy Code does not explicitly define "bad faith" under § 303(i)(2).[171]  Although the standard for what constitutes bad faith varies from circuit to circuit, the Fifth Circuit in *In re Sims* has stated that the criteria for bad faith is a motivation to file by "ill will, malice or for the purpose of embarrassing or harassing the debtors."[172]  In that case, the Fifth Circuit also found that an involuntary petition was not filed in bad faith because the creditor conducted a reasonable inquiry into the facts and the law prior to filing the petition as required by Bankruptcy Rule 9011.[173]  Thus, the Fifth Circuit considers both subjective and objective factors in determining whether an involuntary petition was filed in bad faith.[174]

Here, Target Debtor raised the issue of bad faith in post-trial briefing, and requests the Court to award appropriate damages caused by Petitioning Creditors' alleged bad faith filing of the Amended Involuntary Petition pursuant to § 303(i)(2).[175]  The burden is on Target Debtor in

---

[170] ECF No. 48.
[171] *See In re CorrLine Int'l, LLC*, 516 B.R. at 141.
[172] *In re Sims*, 994 F.2d at 222.
[173] *Id.*; *see In re Walden*, 781 F.2d 1121, 1122–23 (5th Cir. 1986).
[174] *In re Acis Capital Mgmt., L.P.*, 604 B.R. at 531 ("The Fifth Circuit has not expressly endorsed any particular standard, but it has considered both objective and subjective factors in deciding whether an involuntary petition was filed in bad faith.").
[175] ECF No. 48.

proving that an involuntary petition was filed in bad faith.[176]   Target Debtor contends that Petitioning Creditors' misused the involuntary bankruptcy mechanism to collect a purported debt from HL Builders among other indicia of bad faith.[177]   At trial, during cross-examination by Target Debtor's counsel, Foster testified as follows:

> Q: Now I asked you did you file this just to attempt to collect debts against HL Builders as a collection pursuit?
>
> A: Well, if I could answer, it was multiple --
>
> Q: Yes.
>
> A: -- multiple reasons. Yeah, ideally I'd love to collect all the debt now that is owed. But there are multiple reasons if you'd like to hear them.
>
> Q: I wanted to understand if you filed it to attempt to collect money from HL.
>
> A: The Chapter 11?
>
> Q: Involuntary.
>
> A: Oh, the involuntary?
>
> Q: Yeah.
>
> A: I believe so, yes, because we -- there's a lot of money owed.[178]

---

[176] *In re TRED Holdings, L.P.*, 2010 WL 3516171, at *7 (Bankr. E.D. Tex. Sept. 3, 2010); *see In re Synergistic Techs., Inc.*, 2007 WL 2264700, at *6 (Bankr. N.D. Tex. Aug. 6, 2007).

[177] *Id.* (Target Debtor's made the following allegations as indicia of Petitioning Creditors' bad faith: (a) the lack of valid, undisputed claims to support the filing; (b) the failure to check-the-box on the amended petition that debtor is generally not paying its undisputed debts as they become due; (c) the Foster Entities are themselves notoriously insolvent debtors; (d) the Foster Entities' motion to consolidate HL Builders' involuntary bankruptcy proceeding with the Foster Entities' Bankruptcies; (e) the Foster Entities' motion to appoint a trustee in HL Builders' involuntary bankruptcy proceeding (thus attempting to oust HL Builders' opposition to the Foster Entities' Bankruptcy); (f) the Order entered by [our Sister Court] in the Foster Entities' Bankruptcy that HL Builders has been the only party opposing the Foster Entities' conduct of their proceedings; (g) Counsel for the Foster Entities are very experienced bankruptcy attorneys; (h) the principal of the Foster Entities is a sophisticated, board certified attorney who is the only person who stands to benefit from the proposed plans filed by the Foster Entities in their chapter 11 bankruptcy proceedings; and (i) the Foster Entities' involuntary petition against HL Builders, absent punishment for bad faith filing, leaves HL Builders without the possibility of recovering its damages resulting from the conduct undertaken by Charles Foster, the Foster Entities, and their attorneys.).

[178] 7/16/19 Hr. 105: 2–16.

Target Debtor argues that because Foster testified that the Amended Involuntary Petition was filed as a collection tactic, it was done so in bad faith.[179]  However, while it is possible that the filing of the Amended Involuntary Petition was made in bad faith, under current Fifth Circuit precedent, the evidence presented at trial by Target Debtor was insufficient for this Court to make such a determination.  Importantly, an award of damages under § 303(i) is permissive, not mandatory.[180]  Accordingly, given the scant evidence produced at trial on the issue, the Court is unable to find and does not find that Petitioning Creditors acted in bad faith in filing the Amended Involuntary Petition.  Therefore, Target Debtor's request for an award of damages and punitive damages pursuant § 303(i)(2) is denied.

### III.      CONCLUSION

For the foregoing reasons, the Amended Involuntary Petition is dismissed, HL Builders, LLC's counsel, within thirty days of the issuance of this Court's order, is invited to file an application for reasonable attorney's fees and costs in accordance with 11 U.S.C. § 303(i)(1), and the Emergency Motion for Joint Administration of Cases along with the Emergency Motion to Appoint a Chapter 11 Trustee is denied as moot.[181]

A Judgment consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

SIGNED 02/18/2020.

_____
Eduardo V. Rodriguez
United States Bankruptcy Judge

---

[179] 8/20/19 Hr. 113: 16–25 ("when you file an involuntary bankruptcy as a collection tactic solely, that's bad faith, purely bad faith . . . Mr. Foster testified this was brought as a collection lawsuit.").
[180] 11. U.S.C. § 303(i) (. . .the court *may* grant judgment . . .").
[181] ECF Nos. 23, 2, 3.